SANTA CRUZ FRUIT PACKING CO. *v.* NATIONAL LABOR RELATIONS BOARD.

No. 536.   Argued March 7, 1938.—Decided March 28, 1938.

454

*Mr. J. Paul St. Sure* for petitioner.

456

*Mr. Charles Fahy,* with whom *Solicitor General Reed, Assistant Solicitor General Bell,* and *Messrs. Robert L. Stern, Robert B. Watts, Laurence A. Knapp* and *Philip Levy* were on the brief, for respondent.

458

By leave of Court, *Messrs. H. W. O'Melveny, Walter K. Tuller,* and *Louis W. Myers* filed a brief as *amici curiae,* supporting petitioner.

MR. CHIEF JUSTICE HUGHES delivered the opinion of the Court.

The National Labor Relations Board on April 2, 1936, after hearing, found that petitioner, Santa Cruz Fruit Packing Company, a California corporation, had been engaged in unfair labor practices affecting commerce within the meaning of § 8, subdivisions (1) and (3) and § 2, subdivisions (6) and (7) of the National Labor Relations Act, and ordered petitioner to desist from such practices, to reinstate with back pay certain employees who had been discharged, and to post appropriate notices. 1 N. L. R. B. 454. Upon petition of the Board, the Circuit Court of Appeals affirmed the order so far as it related to petitioner's employees at its Oakland plant. 91 F. (2d) 790. In view of the importance of the question with respect to the application of the National Labor Relations Act, this Court granted certiorari.

There is no dispute as to the pertinent facts. The findings of the Board, supported by evidence, show the following:

Petitioner is engaged at its plant at Oakland in canning, packing and shipping fruit and vegetables, the bulk of

which are grown in that State. During the "peak" season, petitioner employs from 1200 to 1500 persons of whom about 30 are warehousemen. The total "pack" in the year 1935 amounted to about 1,699,270 cases. Of this amount about 37 per cent. were shipped in interstate or foreign commerce, 9.02 per cent. being sent to foreign countries and approximately 473,620 cases, or about 27.89 per cent. to various points in the United States outside California. The sales to purchasers outside the State were under either f. o. b. or c. i. f. San Francisco Bay Point contracts.

The methods of transportation are by water, rail and truck. Export shipments go by water and this is also the chief sort of carriage to points within the United States outside California, about 20 per cent. being shipped by rail and an undetermined amount by truck directly to the point of destination. "There is a constant stream of loading and shipping of products" out of petitioner's plants throughout the entire year. From 3,000 to 4,000 cases are loaded daily in the various vehicles of conveyance. That loading is a substantial and regular part of the work of the warehousemen in petitioner's employ. When the shipments are by rail or overland trucks, these employees load directly into the equipment of the principal carriers. When shipments are by boat, the warehousemen load the cases into the trucks which carry the goods to the docks.

Weighers, Warehousemen and Cereal Workers Local 38–44, International Longshoremen's Association, is a labor organization affiliated with the American Federation of Labor. Its efforts to organize the Oakland plant were begun in July, 1935, and many of the permanent warehousemen made application for membership. When this came to the attention of petitioner early in August, the General Manager announced that he would not permit a union in the plant because of competitive conditions. On their return from a union meeting at which the men

462

were to be initiated, members of the night shift were prevented from entering the plant and the next morning the members of the day crew were similarly excluded. A picket line then formed, on the morning of August 8th, was maintained until September 27th with such effectiveness that eventually the movement of trucks from warehouses to wharves ceased entirely. The Board found: "The teamsters refused to haul Santa Cruz merchandise; the warehousemen at the dock warehouses who ordinarily unload the canned goods from the cars prior to their reloading into the ships, since they were members of the same union as the Santa Cruz warehousemen, also declined to handle Santa Cruz cargo. As members of the sister union, I. L. A. 38–79, the stevedores who move the goods from dock to ship also refused to move Santa Cruz cargo both at the East Bay and San Francisco docks during the entire period that the picket line was maintained. Other unions whose members refused to move 'hot' Santa Cruz cargo were those members of the Sailors who comprised the crews of steam schooners and whose duties include the handling of cargo." Petitioner points out that the refusal of the other unions to handle petitioner's goods was a violation of an arbitration award made in October, 1934, following the San Francisco maritime strike of that year.

The Board found that interference with the activities of employees in forming or joining labor organizations results in strikes and industrial unrest which habitually have had the effect in the canning industry of impeding the movement of canned products in interstate and foreign commerce. Reference was made to official statistics of the United States Department of Labor in relation to the canning and preserving industries from which it appeared that of the fifteen strikes and lockouts in 1934, and the first six months of 1935, eight were the outcome of difficulties in regard to union recognition and discrimi-

nation for union activities, 7,484 workers being involved in those stoppages.

The Board concluded that the discharge of the employees named and the refusal to reinstate them constituted an unlawful discrimination under the National Labor Relations Act and that the acts of petitioner had led and tended to lead to labor disputes burdening and obstructing commerce.

Petitioner contends that the manufacturing and processing in which petitioner is engaged are local activities and that the Board was without jurisdiction over the labor dispute involved in this case.

*First.* There is no question that petitioner was directly and largely engaged in interstate and foreign commerce. We have often decided that sales to purchasers in another State are not withdrawn from federal control because the goods are delivered f. o. b. at stated points within the State of origin for transportation. See *Savage* v. *Jones,* 225 U. S. 501, 520; *Texas & N. O. R. Co.* v. *Sabine Tram Co.,* 227 U. S. 111, 114, 122; *Pennsylvania R. Co.* v. *Clark Bros. Coal Mining Co.,* 238 U. S. 456, 465–468. A large part of the interstate commerce of the country is conducted upon that basis and the arrangements that are made between seller and purchaser with respect to the place of taking title to the commodity, or as to the payment of freight, where the actual movement is interstate, do not affect either the power of Congress or the jurisdiction of the agencies which Congress has established. *Pennsylvania R. Co.* v. *Clark Bros. Coal Mining Co., supra.*

*Second.* The power of Congress extends not only to the making of rules governing sales of petitioner's products in interstate commerce, as, for example, with respect to misbranding under the Federal Food and Drugs Act (21 U. S. C., §§ 1 to 26), or with respect to forbidden dis-

criminations in prices under the Clayton Act (15 U. S. C. 13), but also to the protection of that interstate commerce from burdens, obstructions and interruptions, whatever may be their source. *Second Employers' Liability Cases,* 223 U. S. 1, 51. The close and intimate effect which brings the subject within the reach of federal power may be due to activities in relation to productive industry, although that industry when separately viewed is local. It is upon this well-established principle that the constitutional validity of the National Labor Relations Act has been sustained. *National Labor Relations Board* v. *Jones & Laughlin Steel Corp.,* 301 U. S. 1, 38.

Petitioner urges that the principle is inapplicable here as the fruits and vegetables which petitioner prepares for shipment are grown in California and petitioner's operations are confined to that State. It is not a case where the raw materials of production are brought into the State of manufacture and the manufactured product is handled by the manufacturer in other States. In view of the interstate commerce actually carried on by petitioner, the conclusion sought to be drawn from this distinction is without merit. The existence of a continuous flow of interstate commerce through the State may indeed readily show the intimate relation of particular transactions to that commerce. *Stafford* v. *Wallace,* 258 U. S. 495, 516; *Chicago Board of Trade* v. *Olsen,* 262 U. S. 1, 33. But, as we said in the *Jones & Laughlin* case, the instances in which the metaphor of a "stream of commerce" has been used are but particular, and not exclusive, illustrations of the protective power which Congress may exercise. "The congressional authority to protect interstate commerce from burdens and obstructions is not limited to transactions which can be deemed to be an essential part of a 'flow' of interstate or foreign commerce. Burdens and obstructions may be due to injurious actions springing from other sources." *Id.,* p. 36.

Such injurious action burdening and obstructing interstate trade in manufactured articles may spring from labor disputes irrespective of the origin of the materials used in the manufacturing process. And the place where the manufacturer makes his sales is not controlling if the sales in fact are in interstate commerce. A few illustrations, from our many decisions, will suffice. In *Loewe v. Lawlor* [1908], 208 U. S. 274, 302, the conspiracy of the "United Hatters," to compel the plaintiffs to unionize their factory, was held to fall within the Federal Anti-Trust Act because it was aimed at the destruction of the interstate trade in the manufactured hats. In *United Mine Workers v. Coronado Co.* [1922], 259 U. S. 344, 407, 408, the Court said that "Coal mining is not interstate commerce and the power of Congress does not extend to its regulation as such," but that "if Congress deems certain recurring practices, though not really part of interstate commerce, likely to obstruct, restrain or burden it, it has the power to subject them to national supervision and restraint." And in the second *Coronado* case [1925], 268 U. S. 295, 310, the Court held that the evidence was adequate to show that the purpose was to stop the production of non-union coal and prevent its shipment to markets of other States, and that a combination to that end would constitute a direct violation of the Anti-Trust Act. Another illustration is found in *Bedford Cut Stone Co. v. Journeymen Stone Cutters' Assn.* [1927], 274 U. S. 37, 48, where a conspiracy of stone cutters was held to have "the immediate purpose and necessary effect of restraining future sales and shipments in interstate commerce" of the building stone which was quarried at petitioner's plants.

With respect to the federal power to protect interstate commerce in the commodities produced, there is obviously no difference between coal mined, or stone quarried, and fruit and vegetables grown. The same principle must apply, and has been applied, to injurious restraints of

interstate trade which are caused by the practices of manufacturers and processors. *Standard Oil Co.* v. *United States,* 221 U. S. 1; *United States* v. *American Tobacco Co.,* 221 U. S. 106. The case of *Carter* v. *Carter Coal Co.,* 298 U. S. 238, did not establish a different principle or overrule the decisions which we have cited. See *National Labor Relations Board* v. *Jones & Laughlin Steel Corp., supra,* p. 41. Nor are the cases in point which are cited by petitioner with respect to the exercise of the power of the State to tax goods, which have not begun to move in interstate commerce or have come to rest within the State, or to adopt police measures as to local matters. In that class of cases the question is not with respect to the extent of the power of Congress to protect interstate commerce, but whether a particular exercise of state power in view of its nature and operation must be deemed to be in conflict with that paramount authority. *Bacon* v. *Illinois,* 227 U. S. 504, 516; *Stafford* v. *Wallace, supra,* p. 526; *Minnesota* v. *Blasius,* 290 U. S. 1, 8.

*Third.* It is also clear that where federal control is sought to be exercised over activities which separately considered are intrastate, it must appear that there is a close and substantial relation to interstate commerce in order to justify the federal intervention for its protection. However difficult in application, this principle is essential to the maintenance of our constitutional system. The subject of federal power is still "commerce," and not all commerce but commerce with foreign nations and among the several States. The expansion of enterprise has vastly increased the interests of interstate commerce but the constitutional differentiation still obtains. *Schechter Corporation* v. *United States,* 295 U. S. 495, 546. "Activities local in their immediacy do not become interstate and national because of distant repercussions." *Id.,* p. 554.

To express this essential distinction, "direct" has been contrasted with "indirect," and what is "remote" or "dis-

tant" with what is "close and substantial." Whatever terminology is used, the criterion is necessarily one of degree and must be so defined. This does not satisfy those who seek for mathematical or rigid formulas. But such formulas are not provided by the great concepts of the Constitution such as "interstate commerce," "due process," "equal protection." In maintaining the balance of the constitutional grants and limitations, it is inevitable that we should define their applications in the gradual process of inclusion and exclusion.

There is thus no point in the instant case in a demand for the drawing of a mathematical line. And what is reasonably clear in a particular application is not to be overborne by the simple and familiar dialectic of suggesting doubtful and extreme cases. The critical words of the provision of the National Labor Relations Act in dealing with the described labor practices are "affecting commerce," as defined. § 2 (6). It is plain that the provision cannot be applied by a mere reference to percentages and the fact that petitioner's sales in interstate and foreign commerce amounted to 37 per cent., and not to more than 50 per cent., of its production cannot be deemed controlling. The question that must be faced under the Act upon particular facts is whether the unfair labor practices involved have such a close and substantial relation to the freedom of interstate commerce from injurious restraint that these practices may constitutionally be made the subject of federal cognizance through provisions looking to the peaceable adjustment of labor disputes.

The question of degree is constantly met in other relations. It is met whenever the Interstate Commerce Commission is required to find whether an intrastate rate or practice of an interstate carrier causes an undue and unreasonable discrimination against interstate or foreign commerce. 49 U. S. C. § 13(4). *The Shreveport Case,* 234 U. S. 342, 351. It is met under the Federal Employers' Liability Act, where the question is whether the

employee's occupation at the time of his injury is "in interstate transportation or work so closely related to such transportation as to be practically a part of it." *Chicago & N. W. Ry. Co.* v. *Bolle*, 284 U. S. 74, 78, 79; *New York, N. H. & H. R. Co.* v. *Bezue*, 284 U. S. 415, 420. It is met in the enforcement of the Clayton Act in determining whether the effect of the described provisions in contracts for the sale of commodities is "to substantially lessen competition." 15 U. S. C., 13, 14. *Standard Fashion Co.* v. *Magrane-Houston Co.*, 258 U. S. 346, 356, 357; *Federal Trade Comm'n* v. *Raladam Co.*, 283 U. S. 643, 647, 648.

Such questions cannot be escaped by the adoption of any artificial rule.

*Fourth.* The direct relation of the labor practices and the resulting labor dispute in the instant case to interstate commerce and the injurious effect upon that commerce are fully established. The warehousemen in question were employed by petitioner in loading its goods either into the cars of carriers or into the trucks which transported the goods to the docks for shipment abroad or to other States. The immediacy of the effect of the forbidden discrimination against these warehousemen is strikingly shown by the findings of the Board. When the men found themselves locked out because of their joining the union, they at once formed a picket line and this was maintained with such effectiveness that eventually "the movement of trucks from warehouse to wharves ceased entirely." The teamsters refused to haul, the warehousemen at the dock warehouses declined to handle, and the stevedores between dock and ship refused to load, petitioner's goods. These became, in the parlance of the men, "hot" cargo. Petitioner says that this was an unlawful conspiracy of those sympathizing with its discharged warehousemen, but it was the discrimination against them which led directly to the interference

with the movement from the plant and elicited the support so effectively given.

It would be difficult to find a case in which unfair labor practices had a more direct effect upon interstate and foreign commerce.

The relief afforded by the Board, in requiring petitioner to desist from the unfair labor practices condemned by the Act and to reinstate the discharged employees with back pay, was properly sustained by the Circuit Court of Appeals, and its order is affirmed.

*Affirmed.*

MR. JUSTICE CARDOZO and MR. JUSTICE REED took no part in the consideration and decision of this case.

MR. JUSTICE BUTLER, dissenting.

*Carter* v. *Carter Coal Co.,* 298 U. S. 238, decided that Congress lacks power to regulate terms and conditions of employment of those engaged in local production of commodities sold and about to be shipped in interstate commerce. The circuit court of appeals found two questions for solution. One was whether upon that point the *Carter* case, in 1936, has been overruled by our decision in 1937 in *Labor Board* v. *Jones & Laughlin,* 301 U. S. 1. The second was whether the power extends to cases where only 39% of goods locally produced are shipped in interstate commerce. The court, one judge dissenting, upheld the order. Each of the judges wrote an opinion; two held this Court has overruled the *Carter* case.

If the decision of the *Carter* case upon the point stated stands, the Board's order cannot be upheld. The lower court made its decision depend upon that question. Save authoritatively to decide it here, there was no reason for granting the writ. But the opinion just announced does not refer to the question.

In the *Jones & Laughlin* and companion cases, four dissenting Justices thought the Court then departed from well-established principles followed in the *Carter* case and quoted (p. 96) a passage from it expounding what it meant by "direct" effect on interstate commerce as distinguished from what is "indirect." And the dissenting opinion insisted (p. 97) that, under the *Carter* decision, the facts in those cases did not disclose any direct effect upon interstate commerce, and said: "A more remote and indirect interference with interstate commerce or a more definite invasion of the powers reserved to the states is difficult, if not impossible, to imagine."

But the dissent failed to elicit from the Court any statement as to whether it meant to overrule the *Carter* case. The opinion does not discuss that case. It does, however, contain the following (p. 41): "In the *Carter* case . . . the Court was of the opinion that the provisions of the statute relating to production were invalid upon several grounds,—that there was improper delegation of legislative power, and that the requirements not only went beyond any sustainable measure of protection of interstate commerce but were also inconsistent with due process. These [meaning the *Schechter* and *Carter*] cases are not controlling here." The later decisions of this Court involving the power of Congress to deal with labor relations in local production do not refer to the *Carter* case. At least until this Court definitely overrules that decision, it should be followed.

Upon the authority of that case, I would reverse the order of the circuit court of appeals on the ground that, as applied here, the Act is unconstitutional.

MR. JUSTICE MCREYNOLDS concurs in this opinion.