## NATIONAL LABOR RELATIONS BOARD
### v. BRADFORD DYEING ASS'N
#### (U. S. A.) et al.
#### No. 3343.

Circuit Court of Appeals, First Circuit.

Aug. 2, 1939.

Lawrence Hunt, of Washington, D. C. (Charles Fahy, Robert B. Watts, Samuel Edes, and Julius Schlezinger, all of Washington, D. C., on the brief), for the Board.

George Paul Slade and Harry Parsons Cross, both of Providence, R. I. (T. Dexter Clarke and Greenough, Lyman & Cross, all of Providence, R. I., on the brief), for Bradford Ass'n.

John Ferguson, of Westerly, R. I., for intervenor-respondent.

Before WILSON and MORTON, Circuit Judges, and BREWSTER, District Judge.

WILSON, Circuit Judge.

This is a petition brought by the National Labor Relations Board, hereinafter referred to as the Board, to enforce its order against the Bradford Dyeing Association, hereinafter referred to as the Association, which is a Rhode Island corporation, having its principal office and place of business at Bradford, a village in the town of Westerly in Rhode Island.

The employees of the Association, organized during the course of the proceedings as the B. D. A. Employees' Federation, which will hereinafter be referred to as the Federation, were permitted on order of the Board to intervene as respondents with certain restrictions as to the examination of witnesses, and which entered into an agreement for collective bargaining with the Association.

Its plant is a medium-sized plant, as such plants go, employing about 750 hands. It processes or finishes during a year approximately 57,000,000 yards of goods and has a monthly payroll of about $75,000.

The business of the Association consists solely of the dyeing and finishing of cotton, rayon and acetate piece goods, which are brought to its plant by converters, as they are termed in the trade, in an unfinished state, being designated as "gray goods" when it comes off the looms after manufacture.

Its entire business is transacted at its plant in Bradford. It has no other offices except it maintains an office in New York City as headquarters for solicitors, so called, who have no authority to take orders from customers, but merely to contact them. They perform similar services to those of advertising mediums. The principal purpose for maintaining headquarters for so-called solicitors, however, is for obtaining information as to the probable character of the goods which may later be received at the plant, and the kind of processing required. These so-called solicitors, however, have nothing to do directly with interstate commerce, or with initiating it as between the respondent and its customers. Materials are forwarded from time to time to the Association at its mill in Bradford by customers without reference to any inducements or activities of the so-called solicitors, and so far as the evidence in the case discloses, upon the sole initiative of the customers.

According to the uncontradicted testimony, contracts for dyestuffs, chemicals, starches and other materials used in dyeing and finishing to the amount of $356,856 annually are made only at Bradford, 60 percent of which are furnished within Rhode Island and 40 percent of which are shipped by the parties supplying them to the respondent's plant from outside the state; but the contract of purchase in such cases is completed at Bradford. In other words, as far as this respondent or its

activities are directly concerned, there is no substantial evidence to warrant a finding that the transportation of these materials by the respondent was ever in interstate commerce. The respondent owns no trucks and carries no goods in or out of the state. All dyestuff materials are delivered at the plant by the seller, free of any shipping charge to the respondent. All fuel oil used in the plant is also purchased in Rhode Island and delivered from storage tanks in Rhode Island.

The method of doing business in this case is for a customer, known in the trade as a converter, who purchases "gray goods" where he pleases, at his own expense, without any direction from the respondent, to ship the goods to the respondent's plant for processing or finishing, as it is called. The freight and all expense of transportation are borne by the customer. The respondent receives it and places it in its storage houses awaiting the customer's order as to the nature of the processing desired. It is not disputed that the title to the goods remains through all the processing in the customer. If insured, the insurance is taken out by the customer. When the processing is finished, which may be in less than five or eight weeks, with occasional exceptions, the respondent awaits directions from the customer for the shipping out of the processed goods. The customer directs and assumes all expense of shipment. Any service performed by the respondent in this respect is solely that of an agent of the customer and within the limits of the state.

There is also lacking substantial evidence that 40 percent of the supplies consisting of chemicals and dyes, which were contracted for in Rhode Island and delivered by the sellers to the respondent's plant in Bradford, were transported by the respondent in interstate commerce, or that they were used by the respondent except at Bradford, though the Board assumed without evidence that they were shipped by the respondent in interstate commerce, but its assumption lacks substantial evidence on which to rest, that would compel this court to accept it as a fact.

At the time of the hearing less than half of the entire capacity of the dyeing and finishing industry in Rhode Island outside the respondent's plant was in use. If its plant had then been closed by reason of a strike, the converters, viz.: the owners of the goods awaiting processing by it, could readily have had their goods dyed and finished without any difficulty by other dyeing and finishing plants in Rhode Island, which at that time had a great deal of spare capacity, and at lower prices than those charged by the respondent.

The respondent, according to uncontroverted testimony, neither sells, transports nor arranges for transportation of the goods into or out of Rhode Island in interstate commerce, which is done in each instance by the customer, who delivers the "gray goods" at the respondent's plant and gives orders for shipment of his goods, after they are finished, to certain points where the customer disposes of them outside of Rhode Island. Every step by the respondent prior to the shipment of the goods out of Rhode Island is a transaction local to Rhode Island, a transaction in intrastate commerce. Chassaniol v. City of Greenwood, 291 U.S. 584, 587, 54 S.Ct. 541, 78 L.Ed. 1004.

These are the facts that may properly be drawn from the uncontroverted evidence presented to this court, or which are supported by substantial evidence as against a mere scintilla and unwarranted inferences.

█ The respondent appeared specially in order to plead to the jurisdiction. In support of its plea it claims that the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., does not apply to its plant, because it is not engaged in interstate commerce. It has repeatedly been decided that the Labor Act has no application unless the respondent's business, in whole or in some degree, is directly conducted in or through interstate commerce; or that in some way by its forced closing, as by a strike of its employees, the free flow of interstate commerce in which it was then directly engaged would be directly obstructed or interrupted. Only acts that directly affect, burden or obstruct interstate or foreign commerce or its free flow are within the reach of congressional control, see cases cited infra.

█ The Constitution and the National Labor Relations Act do not impose collective bargaining upon all industry regardless of its indirect effect upon interstate commerce. It is a well-settled rule that only acts which directly burden or obstruct interstate or foreign commerce, or its free flow, are within the reach of the control of Congress under Clause 3 of Section 8 of Article I of the Federal Constitution, U.S.C.A.; only as thus quali-

fied may an act of Congress be construed as exercising that control within constitutional bounds. Acts which only indirectly affect the flow of commerce between the states are not within the control of Congress, but are left to the control of the several states. Direct in respect to sequence, either in point of time or result, means mediate, nothing intervening.

■ Whether or not a particular action affects commerce in such close and intimate relations as to subject it to federal control, and hence lies within the authority conferred on the Board by Congress under the Labor Relations Act, is left by the statute to be determined in each individual case. National Labor Relations Board v. Jones & Laughlin Steel Corporation, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352; Schechter Poultry Corp. et al. v. United States, 295 U.S. 495, 546, 55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947; Carter v. Carter Coal Company, 298 U.S. 238, 56 S.Ct. 855, 80 L.Ed. 1160; Heisler v. Thomas Colliery Co., 260 U.S. 245, 259, 260, 43 S.Ct. 83, 67 L.Ed. 237.

In the cases cited by the Board, the respondent was clearly engaged at the time of the hearing in transporting goods in interstate commerce. There was therefore no real issue of jurisdiction. In the case of Santa Cruz Fruit Packing Co. v. National Labor Relations Board, 303 U.S. 453, 58 S.Ct. 656, 82 L.Ed. 954, for example, the produce when held by the producer was not in transportation, yet it clearly appeared that it was continually being transported in large quantities in interstate commerce and the free flow of such commerce would obviously be materially affected and obstructed by a strike of the warehousemen at the wharves.

■ The Board's contention is that a shutting down of the respondent's operations by industrial strife would result in the interruption of the free flow of interstate commerce to and from the plant. The Board apparently assumed that the respondent transported goods to its plant and from it, which the uncontroverted evidence disclosed were not the facts; and that through labor disputes in the respondent's plant, it assumed that there would be immediate and serious interference with and obstruction of a substantial and continuous movement of unfinished cloth and dyestuffs across state lines to respondent's plant, and of the finished goods from its plant to various parts of the United States.

The Board's reasoning, if valid, would result in drawing within its jurisdiction every manufacturing and producing plant of whatever nature engaged solely in intrastate business that uses any materials that come from outside of the state in which it is located, whether used in connection with its main business or is only incidental thereto, even if shipped into the state to a manufacturer by the party supplying them without any participation in the shipment by the manufacturing or the processing plant itself. The stopping of intrastate activities at such plants through labor disputes would only indirectly affect the party supplying the materials and bringing them into the state and the free flow of interstate commerce between the states.

■ Much stress is laid by the Board on the fact that in the processing of the goods supplied by the customers, more or less waste results, and "torn ends" of the pieces of the processed goods, though they do not exceed 1 percent of the total goods processed, are recognized as the property of the processor; that the customers understand this is an incidental result of the respondent's business, and that in the processing allowance is made by the customer to the processor of these "torn ends" or "rags", as they are termed, as an adjustment for any damages to the goods. These "torn ends" or "rags", as they are termed, have some small value to the respondent, which it disposes of in New York. The amount received therefor does not appear. It was not the principal purpose of its business, but is a mere incident thereof, and to which the maxim de minimis might well be applied, even by the National Labor Relations Board.

The shipment of 1 percent of the cloth processed in the form of remnants or "rags", consisting of the "torn ends" of the pieces processed, which the respondent was permitted by the customer to have and which it sold in New York, is so remote from the main purpose of its business and is simply only a mere incident thereof, that Congress could not have intended that such transactions alone could subject the entire business of a plant to the penalties that may be imposed by the Labor Board under the Act.

We have not overlooked the opinion of the Supreme Court in the case of National Labor Relations Board v. Fainblatt, 59 S.Ct. 668, 83 L.Ed. 1014, decided April 17,

1939, and have considered the facts in this case in the light of the decision of the court in National Labor Relations Board v. Fansteel Metallurgical Corporation, 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627, decided February 27, 1939. There appears to be a difference in the facts in this case and in the Fainblatt case, and in the cases cited therein, and in the decision of the court.

In the Fainblatt case the strike of the workers clearly affected interstate commerce, and within certain limits interfered with the free flow of interstate commerce by reducing it.

In National Labor Relations Board v. Jones & Laughlin Corp., 301 U.S. 1, 49, 57 S. Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352; National Labor Relations Board v. Friedman-Harry Marks Clothing Company, 301 U.S. 58, 57 S.Ct. 645, 630, 81 L.Ed. 921, 108 A.L.R. 1352; Santa Cruz Packing Company v. National Labor Relations Board, 303 U.S. 453, 463, 58 S.Ct. 656, 82 L.Ed. 954, et seq., the respondents were actually engaged in interstate commerce and the labor strikes in those cases clearly interfered with the free flow of such commerce.

In this case there was no strike, and no actual effect on interstate commerce. As to whether a strike closing down the respondent's plant, or lessening its output, would affect interstate commerce, is problematical. Owing to the many similar plants in Rhode Island, a small state with unused capacity for processing cloth sufficient to easily take care of the respondent's customers, it is purely hypothetical whether a labor dispute in the respondent's plant would materially affect the flow of commerce from Rhode Island to or from other states. There was no evidence that the labor dispute between the C. I. O. or T. W. O. C. and the Federation in this case affected the flow of commerce to and from its plant in the slightest degree.

There was no strike. Only two men were suspended temporarily who refused to return to work and apparently voluntarily abandoned their jobs. Even assuming that the Board was warranted in finding that the president of the company and some of its officers, or departmental heads, made known to the employees their preference for the Federation, or the shop Union, and influenced a sufficient number of the employees to constitute a majority of the employees to join the Federation, as it is termed, which was formally organized with officers—which cannot be said of the hostile branch or affiliate of the C. I. O.—there is no evidence that any labor disputes have since arisen in the plant.

■ We think the order of the Board should not stand in its entirety, and particularly the cease and desist order of paragraph 4, since it does not appear that any such an organization as the T. W. O. C.—the branch or affiliate of the C. I. O. —ever came into actual existence with authority to negotiate a contract with the respondent. Its sponsors refused to disclose how many employees of the respondent had actually indicated an intent to become members of such a body, if organized.

Assuming that the president or officers of the respondent influenced its employees to join the Federation, so called, it does not appear by clear and substantial evidence that a majority of the employees ever joined, or indicated an intent to join, the T. W. O. C., and to order the Federation to disband and the respondent to no longer recognize it as the negotiating body, would leave the employees without any legitimate body to represent them in case of a labor dispute arising. The finding by the Board that the T. W. O. C. had a majority of the employees of the respondent signed up even to become members of a union under that name is without substantial evidence on which to rest.

■ As to the affirmative part of the order that the respondent should offer to reinstate Percy Schofield and Edward Nelson, two employees laid off, one for deliberately violating the rules of the plant against smoking in the plant, the other for insubordination, with full pay from the time they were laid off, and who refused to return at the end of their term of suspension, thus abandoning their jobs with the respondent; and who on the outside sought to aid the C. I. O. or its branch, T. W. O. C., in its efforts to organize the employees of the respondent, and in the furtherance of this effort committed unlawful acts by endeavoring, with one Rhodes on the inside, to induce the workers in the plant to participate in a "sit-down strike", which was at the time a common method in the middle west to force employers to agree to striking employees' terms, and Nelson even threatened truck drivers delivering materials to

the plant with violence, and to destroy spur tracks over which materials were delivered to the plant, we think it cannot be enforced. There unlawful acts of inciting a "sit-down" strike were not denied, and the evidence of Rhodes' participation was excluded by the Examiner.

The acts of Schofield and Nelson in inciting their fellow workers to indulge in a "sit-down strike" were equally as unlawful as the acts of those aiding and abetting their fellow workers in their forcible occupation of their employer's property, whom the Court held the Board had no authority to order the respondent to reinstate in its employ with back pay. National Labor Relations Board v. Fansteel Metallurgical Corporation, supra.

Of certain employees who aided and abetted those forcibly occupying the respondent's property by supplying them with food, the Court said in the Fansteel Metallurgical Corporation case [306 U.S. 240, 59 S.Ct. 498]:

"It cannot be said that independently of the Act respondent was bound to reinstate those who had thus aided and abetted the 'sit-down' strikers in defying the court's order. If it be assumed that by virtue of Section 2(3) they still had the status of 'employees' [29 U.S.C.A. § 152, subd. 3] that provision did not automatically provide reinstatement. Whether the Board could order it must turn on the application of the provision empowering the Board to require 'such affirmative action, including reinstatement of employees' as will 'effectuate the policies' of the Act. We are thus returned to the question already discussed and we think that in that respect these aiders and abettors, likewise guilty of unlawful conduct, are in no better case than the 'sit-down' strikers themselves. We find no ground for concluding that there is any policy of the Act which justifies the Board in ordering reinstatement in such circumstances."

■ There is no basis in the Wagner Act (29 U.S.C.A. § 151 et seq.) for the Board to compel an employer to take back employees who have voluntarily refused to return to their jobs after being temporarily laid off for cause, and who have, while laid off, indulged in unlawful acts, such as attempting to incite their fellow employees to indulge in a "sit-down strike", or any other unlawful acts. The reinstatement in such case is not a matter of discretion, as the court stated in the Fansteel case.

In construing the Act in National Labor Relations Board v. Jones & Laughlin Steel Corporation, 301 U.S. 1, 45, 46, 57 S.Ct. 615, 628, 81 L.Ed. 893, 108 A.L.R. 1352, the court said:

The Labor Relations Act "does not interfere with the normal exercise of the right of the employer to select its employees or to discharge them. The employer may not, under cover of that right, intimidate or coerce its employees with respect to their self-organization and representation, and, on the other hand, the Board is not entitled to make its authority a pretext for interference with the right of discharge when that right is exercised for other reasons than such intimidation and coercion."

The Board, in exercising its authority under Section 10(c), 29 U.S.C.A. § 160 (c), to reinstate "employees", has insisted that the status of the employees continue, by virtue of the definition of the term "employee" in Section 2(3) of the Act, 29 U.S.C.A. § 152(3), despite their discharge for unlawful conduct.

We are unable to conclude, however, that Congress intended to compel employers to retain persons in their employ, or reemploy them, regardless of their unlawful conduct; and, as a result, to invest those who go on strike with an immunity from discharge for acts of trespass or violence against the employer's property, or attempts to incite their fellow employees to commit unlawful acts in or against their employer's property, which they would not have enjoyed had they remained at work. Apart from the question of the constitutional validity of an enactment of that sort, it is enough to say that such a legislative intention should be found in some definite and unmistakable expression. We find no such expression in the Act. National Labor Relations Board v. Fansteel Metallurgical Corporation, supra.

The authority to require affirmative action to "effectuate the policies" of the Act is broad, but it is not unlimited. It has the essential limitations which inhere in the very policies of the Act which the Board invokes. Thus in Consolidated Edison Company v. National Labor Relations Board, 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126, it was held: that the authority to order affirmative action did not go so far

as to confer a punitive jurisdiction enabling the Board to inflict upon the employer any penalty it may choose because he is engaged in unfair labor practices, even though the Board is of the opinion that the policies of the Act may be effectuated by such an order; that the power to command affirmative action is remedial, not punitive; or require the employer to comply with orders that offend one's sense of justice; and is to be exercised only in aid of the Board's authority to restrain violations and as a means of removing or avoiding the consequences of violation where those consequences are of a kind to thwart the purpose of the Act.

"There is not a line in the statute to warrant the conclusion that it is any part of the policies of the Act to encourage employees to resort to force and violence in defiance of the law of the land. On the contrary, the purpose of the Act is to promote peaceful settlements of disputes by providing legal remedies for the invasion of the employees' rights." National Labor Relations Board v. Fansteel Metallurgical Corporation, supra.

Elections may be ordered to decide what representative unit is desired by the majority of employees to represent them in labor disputes as determined by the Board. To secure the prevention of unfair labor practices by employers, complaints may be filed and heard and orders made. The affirmative action that is authorized is to make these remedies effective in the redress of the employees' rights, to assure them self-organization and freedom in representation, not to license them to commit tortious acts or to protect them from the appropriate consequences of unlawful conduct. We are of the opinion that to provide for the reinstatement or reemployment of employees guilty of the acts, which it is not denied were committed in this instance, would not only not effectuate any policy of the Act, but would directly tend to make abortive its plan for peaceable procedure.

If the case should not be dismissed for lack of jurisdiction, we are of the opinion that the order of the Board that these two men shall be reinstated, is not warranted by the Act or the evidence before the Board, and must be vacated; and as no election has been held, that the Board should order an election by the employees to determine which group, if either, they will select to represent them in labor disputes between themselves and the respondent.

Until a new election has taken place by order of the Board, and the employees have expressed their preference as to what group or body shall represent them in any labor disputes between them and the respondent, the order of the Board, except as to paragraphs 1, 2 and 3 of the cease and desist portion of the order, and the entire paragraph 5 ordering affirmative action shall be vacated, the Board then to proceed in accordance with this opinion.