## NATIONAL LABOR RELATIONS BOARD v. WEST KENTUCKY COAL CO.

### No. 8334.

Circuit Court of Appeals, Sixth Circuit.

Nov. 15, 1940.

Philip G. Phillips, of Cincinnati, Ohio (Charles Fahy, Robert B. Watts, Laurence A. Knapp, Richard C. Barrett, and A. Norman Somers, all of Washington, D.C., on the brief), for petitioner.

Maurice K. Gordon and Gordon & Gordon & Moore, all of Madisonville, Ky., and James G. Wheeler, of Paducah, Ky., (Maurice K. Gordon, James G. Wheeler, Neville Moore, Earle M. Nichols, and Abner Johnston, Jr., all of Madisonville, Ky., on the brief), for respondent.

Chas. G. Franklin, of Madisonville, Ky. for intervenor.

Before SIMONS, ALLEN and ARANT, Circuit Judges.

ARANT, Circuit Judge.

Charges of unfair labor practices were filed with the National Labor Relations Board against respondent by the United Mine Workers of America, District No. 23, in the summer of 1937. On December 2, the Board issued its complaint and served notice of hearing upon the Union and respondent. The Employes' Mutual Benefit Association was permitted to intervene. After hearing, the Board issued an order, which it now petitions this Court to enforce.

The complaint charged that respondent had dominated and interfered with the administration of the Employes' Mutual Benefit Association and contributed financial and other support; that it had discriminated against certain employees by discharging them for union activity and membership; that it had refused to bargain collectively with the Union as representative of the production employees in its mines 2 and 8; and that it had otherwise interfered with, restrained and coerced employees in the exercise of rights guaranteed by § 7 of the National Labor Relations Act, thereby engaging in unfair labor practices within the meaning of § 8 (1), (2), (3) and (5) and § 2 (6) and (7) of the Act, 29 U.S.C.A. §§ 157, 158 (1–3, 5) 152(6, 7).

Respondent claimed that the operation of its business did not affect interstate commerce within the meaning of the Act and denied that it had committed any of the unfair labor practices charged. The Association denied that it had been dominated, interfered with, or supported by respondent since October, 1935, but admitted that it had received financial contributions from respondent theretofore.

On the last day of the hearing the Union filed a petition requesting the Board to conduct an investigation and certify the bargaining representative of respondent's production employees in mines 2 and 8. Separate hearing upon this petition was waived by stipulation, the parties agreeing that, in its investigation of the question of representation, the Board might consider the record in the complaint proceeding, which contained all the pertinent evidence.

The two proceedings were thereupon consolidated.

The Board found that since July 5, 1935, the effective date of the Act, respondent had dominated and interfered with the administration of the Association and had contributed financial and other support; that it had discriminated in respect to hire and tenure by discharging five employees because of union activity and membership; and that it had otherwise interfered with, restrained and coerced its employees in the exercise of rights guaranteed in § 7 of the Act. The Board concluded that respondent had engaged and was engaging in unfair labor practices affecting interstate commerce within the meaning of § 8(1), (2) and (3) and § 2(6) and (7) of the Act. Such portions of the complaint as charged that respondent had discriminated against Albert Johnson, Miles Cannon and George Hughes, and had refused to bargain collectively with the Union were dismissed.

The Board ordered respondent to cease and desist from the unfair labor practices found; to disestablish, withdraw all recognition from and cease giving effect to contracts made with the Association as representative of its employees; to reimburse employees for all deductions from their wages for Association dues or assessments since July 5, 1935; to reinstate, with back pay, the five employees found to have been unfairly discharged; and, upon request, to bargain collectively with the United Mine Workers of America, District No. 23, in the event that it is certified as the exclusive bargaining representative after the election ordered by the Board.

■ Respondent is a New Jersey corporation. It operates eight coal mines in three counties in Western Kentucky, in which its production employees number 2,500. Its annual production exceeds 2,-000,000 tons, fifty-nine percent of which is shipped to points outside Kentucky. Its mines are connected to interstate railroads, to which it sells about 300,000 tons of coal annually. It owns and uses ten miles of railroad, three locomotives, a number of cars and a car shop. It controls coal yards in Kentucky, Tennessee, Indiana and Nebraska, in which coal mined by itself and others is sold. At Paducah, Kentucky, it maintains and operates facilities for the transportation of coal on the Ohio River. It also operates steam and tug boats on the Mississippi. Eighty percent of its supplies and equipment are purchased outside of Kentucky, amounting annually to some $300,000. It is clearly subject to the jurisdiction of the Board. Cf. National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352; Santa Cruz Fruit Packing Co. v. N. L. R. B., 303 U.S. 453, 58 S.Ct. 656, 82 L.Ed. 954; National Labor Relations Board v. Fainblatt, 306 U.S. 601, 59 S.Ct. 668, 83 L.Ed. 1014.

■ The Association was established under the direction of Respondent's president, in September, 1918. It was originally governed by a joint council of seven, three of whom were appointed by the management, while the remaining four were selected by the employees at elections held on the company time and property. Employees generally understood that membership in the Association was compulsory, and practically every employee joined. Respondent's president and general superintendent, as well as other executive and supervisory officials, were members, regularly attended meetings and participated in the discussions.

Terms and conditions of employment were established annually by contract between respondent and the employee members of the joint council. Proposed contracts were not discussed at Association meetings, approval of the employees being inferred from the fact of membership alone. Membership dues were deducted by respondent from employees' earnings and paid to the Association, respondent contributing an equal amount and receiving therefor certificates of membership entitling it to a voting power on amendments to the articles of association equal to that of all employees combined. A three-fourths vote was required to amend the articles.

This was the situation until the latter part of 1933, when the Association's articles were amended to provide that the council should consist of four members only, elected by employees. Management membership continued, however, until February of 1937. The provision for direct financial support was eliminated from the articles in 1934, but respondent actually contributed until September, 1935. Through its attorneys, it also participated in such changes in the articles as were made. The practice of holding elections on company time and property has not been discontinued. Membership in the Association is still con-

sidered a condition of employment, virtually every employee belonging, and respondent continues to deduct Association dues from wages. Terms of proposed contracts are not discussed at meetings, and members of the Association generally are still unaware that any substantial change has been made in the Association since its inception. The Association's assets consist largely of buildings used for Association purposes, acquired through transactions with respondents.

It would unduly lengthen this opinion to discuss the evidence in detail, but there was substantial evidence that in April of 1937, when the Union began a drive to organize respondent's mines, respondent engaged in an active campaign to coerce employees to support the Association and abstain from joining the Union. Employees were followed by guards, their homes were entered under flimsy pretexts while Union representatives were visiting them, and those suspected of Union sympathy were told that the company stood by those who stood by it.

There was substantial evidence that respondent violated § 8(1) and (2) as found by the Board, and the cease and desist order will be enforced. Cf. National Labor Relations Board v. Pennsylvania Greyhound Lines, Inc., 303 U.S. 261, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307.

■ Relying upon § 10(c), the Board ordered respondent to disestablish the Association completely as a bargaining representative and give effect to no labor agreement with it. Respondent contends that this section grants absolute and arbitrary power and is "too vague and indefinite to be of any validity." The contrary is now almost too well settled to need citation of authority, but see National Labor Relations Board v. Pennsylvania Greyhound Lines, Inc., supra; National Labor Relations Board v. Newport News Shipbuilding & Dry Dock Co., 308 U.S. 241, 60 S.Ct. 203, 84 L.Ed. 219; National Labor Relations Board v. Falk Corp., 308 U.S. 453, 60 S.Ct. 307, 84 L.Ed. 396. The Association asserts that the order deprives it of property without due process of law and that, in consequence, we cannot constitutionally be denied the right to review all the evidence and make our own findings therefrom. We have reviewed all the evidence: the Board's findings are not only supported by substantial evidence but, in our opinion, correct. The order based

thereon will be enforced. National Licorice Co. v. N. L. R. B., 309 U.S. 350, 60 S.Ct. 569, 84 L.Ed. 799.

■ The Board ordered respondent to "Reimburse, individually and in full, all employees who were, or still are, members of the Employees' Mutual Benefit Association, * * * for all dues and assessments, if any, which it has deducted from their wages, salaries, or other earnings since July 5, 1935, on behalf of Employees' Mutual Benefit Association * * *."

The Association contends that the effect of this order is to offer a monetary inducement to employees to desert the Association and affiliate with some other labor organization. It is sufficient answer to this contention that the order to refund is not conditional upon any action or attitude of an employee.

Respondent urges that the Board exceeded the authority conferred by § 10(c) and cites two cases in which, though general disestablishment orders were sustained, practically identical orders to reimburse were held invalid. In National Labor Relations Board v. Greenebaum Tanning Co., 110 F.2d 984, enforcement was refused by the Seventh Circuit on the ground that it would only discourage the checkoff and restore earnings to employees without depletion of Association assets, which would not effectuate the policies of the Act. The Second Circuit also denied enforcement in Western Union Telegraph Co. v. N. L. R. B., 113 F.2d 992, principally on the ground that its purpose and effect would be to give employees redress for individual wrongs, which is not within the purview of the Act.

The writer of this opinion is unable to agree with either Circuit. Under the circumstances, the checkoff was an unfair labor practice, and he cannot say the policies of the Act will not be promoted by the requirement of a refund of the wrongful deductions. It may well be that checkoffs on behalf of employer-dominated organizations would be discouraged, but this, he thinks, would effectuate the policies of the Act. Through such checkoffs employers have forced employees to support specious bargaining agencies, with the consequence that growth of real collective bargaining has been retarded.

■ The order to reimburse for wrongful checkoffs, though not specifically mentioned in the Act, is analogous to the order to make employees whole by the

payment of back wages and promotes the policies of the Act in the same manner. The writer thinks reinstatement with back pay would have been authorized by § 10 (c) even if it had not been specified; the specification did not add to the Board's power, but illustrated the kind of an affirmative order the Board could make. A proceeding before the Board is not an action at law, and the Board's order does not redress wrongs to individual employees. Though the order sometimes provides for deductions from back pay to the extent of earnings between dismissal and reinstatement, no case has been noted in which the employer was allowed to deduct an amount the employee *might* have earned had he used reasonable diligence to find another job. The wrongful checkoff of dues is neither more nor less tortious than wrongful dismissal; in neither case is there an inquiry as to extent of injury, as the Second Circuit rightly insists there should be in tort actions. The truth is that reinstatement of the employee and payment for time lost are remedies not known to the common law but created by statute. They "are requirements imposed for violation of the statute and are remedies appropriate to its enforcement." Mr. Chief Justice Hughes, in National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 48, 57 S.Ct. 615, 629, 81 L.Ed. 893, 108 A.L.R. 1352. "The procedure the statute outlines is not designed to award, the orders it authorizes do not award, damages as such. The proceeding is not, it cannot be made, a private one to enforce a private right. It is a public procedure, looking only to public ends." Hutcheson, J., Agwilines, Inc. v. N. L. R. B., 5 Cir., 87 F.2d 146, 150.

The writer sees nothing to suggest that the Board's purpose in ordering refunds in any of these cases was to redress wrongs to employees, or to punish employers; rather, he thinks, the purpose was to achieve, as completely as possible, severance of economic ties to employer-dominated associations. The disestablishment order does not, of course, affect the corporate entity of the Association, nor does it affect legal title to buildings and properties owned by it. Despite the order, the Association continues to exist in a very real sense. Members, in the absence of a refund order, might remain firmly enough tied to the Association to impair the efficacy of the disestablishment order; economic ties might cause them to vote against the United Mine Workers' Union in the election ordered by the Board, or to decline to join any other union. Orders to disestablish employer-dominated unions completely have been approved by the Courts in numerous instances, on the ground that such orders promote the policies of the Act. The writer considers the refund ordered a phase of complete disestablishment.

■ It is not our province to consider the wisdom of any order of the Board. The Congress has conferred upon the Board authority to administer the National Labor Relations Act,—which has been upheld by the Supreme Court of the United States,—has directed the Board to issue the cease and desist order when unfair labor practices are found and endowed it with discretion to take such affirmative action as will effectuate the policies of the Act. It is for the Board, not for us, to determine what affirmative order shall issue, and we must enforce it unless there is abuse of discretion. See National Labor Relations Board v. Falk Corp., 308 U.S. 453, 461, 60 S.Ct. 307, 84 L.Ed. 396. Only when the order is so illy adapted to effectuation of the policies of the Act that it must be concluded that the Board had some other end in view can enforcement be refused; only then can it be said there was abuse of discretion.

The foregoing views have led the writer to the conclusion that the order to reimburse should be enforced but, since his colleagues do not share this view and are of the opinion that we should follow the decisions of the Second and Seventh Circuits, supra, the order that respondent refund all dues checked off and paid to the Employes' Mutual Benefit Association will be denied enforcement, from which denial the writer is obliged to dissent.

■ There is substantial evidence to support the Board's finding that the five employees named in paragraph 2(d) were discharged because of union membership or activities in violation of § 8(3), and the order that they be offered reinstatement and made whole will be enforced. Sante Cruz Fruit Packing Co. v. N.L.R.B., 303 U.S. 453, 58 S.Ct. 656, 82 L.Ed. 954; National Labor Relations Board v. Jones & Laughlin Steel Corp., supra.

■ Although there was no finding that respondent had refused to bargain collectively, the Board ordered it "In the event that United Mine Workers of Ameri-

ca, District No. 23, is selected in the election hereinafter directed as the representative of the employees in the appropriate unit, and is thereafter certified by the Board as the exclusive representative of such employees, then, upon request," to "bargain collectively with United Mine Workers of America, District No. 23, as the exclusive representative of all of the respondent's production employees at mines Nos. 2 and 8, * * * in respect to rates of pay, wages, hours of employment, or other conditions of employment." We think this order invalid.

The Board contends that authority to issue a conditional order is conferred by the following language of § 10 (c):

"If upon all the testimony taken the Board shall be of the opinion that any person named in the complaint has engaged in or is engaging in any *such unfair labor practice,* then the Board shall state its findings of fact and shall issue and cause to be served *on such person* an order requiring *such person* to cease and desist from *such unfair labor* practice, and to take *such affirmative action,* including reinstatement of employees with or without back pay, as will effectuate the policies of this chapter. * * * If upon all the testimony taken the Board shall be of the opinion that no person named in the complaint has engaged in or is engaging in any *such unfair labor practice,* then the Board shall state its findings of fact and shall issue an order dismissing the said complaint." (Italics ours.)

"Such unfair labor practice" means the particular practice in which the employer is found to have engaged. "Such affirmative action" as the Board can order must, we think, be directly related to the particular unfair labor practice in which the employer is found to have engaged and from which the Board is directed to order him to cease and desist. Respondent could not be ordered to cease and desist from refusing to bargain collectively, there being no finding that it had refused so to bargain. Nor, we think, could it be ordered, conditionally or otherwise, to bargain collectively at some future time; such an order would render it liable for contempt if, after the conditions precedent had occurred, it refused to bargain collectively. There should be no difference between the status of an employer exonerated of a charge of refusal to bargain collectively and that of

one against whom no such charge has ever been made. The Act plainly requires dismissal of an unproved charge, and the Board followed this direction. We think it equally clear that when a charge of an unfair labor practice has been dismissed, no affirmative order can issue concerning that particular practice. It is significant that the Board has cited no case to the contrary.

With the exception of paragraphs 2(c) and (g), the order of the Board will be enforced.

ALLEN, Circuit Judge.

I concur in other respects in the opinion, but I cannot agree with the view expressed as to the reimbursement of employees for dues and assessments deducted from their wages on behalf of the Employes' Mutual Benefit Association. The order to desist from the use of the checkoff is authorized as a remedy appropriate to the enforcement of the statute; but a reimbursement of the money paid to the association in the checkoff is not authorized by the statute, and would violate the fundamental principles of equity. The checkoff payments, while received by the employer, were not retained for its benefit. The Board found that by means of the checkoff system the employer deducted from the wages of the association members approximately $2,200 per month, which it "turned over" to the association. To affirm the order of reimbursement is to order the employer to restore money paid to another. Neither can I agree that reinstatement with back pay, specifically provided for in the statute, presents an analogous situation, and therefore authorizes the reimbursement. Under the doctrine of expressio uniis, the express provision as to reinstatement, "with or without back pay," excludes other forms of money judgment against an employer. When the checkoff arrangement was made it was not illegal, nor after the passage of the National Labor Relations Act was it clear that such practice was unlawful. Certainly there is nothing in the Act to so characterize it.

There would be no justification under any theory for the Board's compelling the employer to do more than to restore earnings retained by it for its own benefit, even though it might be clear that the retention was unlawful. Otherwise the order would be punitive, and not corrective. But this record does not show that the

employer has retained any earnings for its own benefit. All that it reveals is that the earnings withheld have been received "on behalf of" the association.

Aside from this, there is much to be said for the view expressed in Western Union Telegraph Co. v. National Labor Relations Board, 2 Cir., 113 F.2d 992, that such attempted remedial provision is but the assessment of damages for a mass tort where there has been no proof either of injury or damage to employees who willingly consented to the checkoff and felt amply compensated for the amounts withheld by the benefits received. Cf. National Labor Relations Board v. Greenebaum Tanning Co., 7 Cir., 110 F.2d 984.

I think that the order in this respect does not fall within the purview of the Act, nor within the powers of the Board.

Judge SIMONS concurs.