## NATIONAL LABOR RELATIONS BOARD v. WEYERHAEUSER TIMBER CO., CLEMONS BRANCH.

### No. 10031.

Circuit Court of Appeals, Ninth Circuit.

Dec. 11, 1942.

Robert B. Watts, Gen. Counsel, Ernest A. Gross, Associate Gen., Counsel, Gerhard P. Van Arkel, Asst. Gen. Counsel, Hilda D. Shea, Thomas E. Shroyer, and Ivar H. Peterson, Attys., N. L. R. B., all of Washington, D. C., for petitioner.

W. E. Heidinger, of Tacoma, Wash., for respondent.

Before GARRECHT, HANEY, and HEALY, Circuit Judges.

HEALY, Circuit Judge.

This is a petition of the National Labor Relations Board for the enforcement of its order directed against the respondent, Weyerhaeuser Timber Company, predicated on

the allegedly discriminatory discharge of two employees of the latter.[1]

 Respondent is a corporation engaged in the business of logging and manufacturing lumber and timber products in the State of Washington. Approximately 85% of the product of its lumber mills is sold to customers in states other than Washington. A still larger percentage of the output of its pulp mills is disposed of to customers outside that state. Its business is thus substantially of an interstate character.[2] The case involves the operations of what is known as the Clemons branch. This branch is owned by and is a part of respondent company and is directly under the supervision and management of respondent's officers and directors, although its operations are in general entrusted to a branch manager. We agree with the Board that the operations of the Clemons branch are not to be considered as something separate and apart from other divisions of respondent's business; hence the jurisdiction of the Board is clear.[3]

During 1940 the operations of the Clemons branch were conducted at camps Nos. 2 and 3, located in the woods. One Weiks was foreman in charge of the falling and bucking of timber at both camps, with authority to employ and discharge. He customarily spent one day each week at camp No. 3, the operations of the latter camp being directly under the supervision of one Barman, bull buck, who had authority to hire and discharge the fallers and buckers at that camp.

In October 1939 Seth Nordling and Volney Burchett obtained employment at camp No. 3 as a set of fallers, with Nordling in the position of head faller. The two were assigned by Barman to an area of ground, known as a strip, in which they were to fall timber. Later on they were successively assigned to other strips, including the fourth upon which they were working as a team at the time of their allegedly discriminatory discharge. They were paid at a certain rate per thousand board feet for logs felled. Both had previously been union men and both became members of the sub-local of the International Woodworkers of America which had long been organized at this camp. Prior to his employment at the Clemons branch Nordling had been appointed chairman of the anti-bushelling committee of the International Woodworkers union, in opposition to the bushelling system, a method of paying fallers and buckers at piece-work rates. Nordling was co-author of a pamphlet condemning this practice and demanding that fallers and buckers be paid wages computed on the basis of day rates. There is evidence that this pamphlet was distributed at camp No. 3 about the beginning of 1940 and that Barman obtained a copy.

Both Nordling and Burchett began at once to take an active part in the sub-local's affairs, participating among other things in the discussion and presentation of grievances. It appears that prior to the advent of these two men the sub-local at camp No. 3 had been somewhat inactive because of the difficulty experienced in securing an energetic camp stewart. Nordling and Burchett, particularly the former, were instrumental in revitalizing the sub-local; and in March 1940 Nordling was elected camp steward, a position involving the chairmanship of the organization.

The two men were discharged in April 1940, under circumstances which we will now briefly relate. On April 4 they "stumped" a tree with a resultant loss to the respondent of some 3500 board feet. "Stumping" is an error in falling a tree so that it drops upon a stump or stumps. Barman took no action on the day the tree was stumped, but Weiks appeared at the camp the following day and immediately discharged Nordling and Burchett, stating that the respondent had a rule that any faller stumping a tree would be discharged. At that time the respondent maintained at the camp a notice to the effect that fallers splitting trees on stumps without cause would be docked according to the damage. Weiks himself testified that this rule had not been enforced for some years, and that the penalty imposed upon a faller depended upon the damage done, the amount of blame attaching to the faller, his past experience, and other circumstances of the individual case.

---

[1] National Labor Relations Act § 8 (1, 3), 29 U.S.C.A. § 158(1, 3).

[2] Santa Cruz Fruit Packing Co. v. N.L.R.B., 303 U.S. 453, 58 S.Ct. 656, 82 L. Ed. 954; N.L.R.B. v. Fainblatt, 306 U.S. 601, 307 U.S. 609, 59 S.Ct. 668, 83 L.Ed. 1014.

[3] N. L. R. B. v. Virginia Electric & Power Co., 314 U.S. 469, 476, 62 S.Ct. 344, 86 L.Ed. 348.

The charge investigated by the Board on complaint of the International Woodworkers union was that the men were dismissed because of the active part played by them in the affairs of the sub-local. The Board was of opinion that the charge was sustained by the evidence, and it so found. Respondent argues that the finding is unsupported and that Nordling and Burchett were discharged for poor workmanship.

It must be admitted that the showing is very far from being all on the side of the Board. A committee of the sub-local, appointed to investigate the question of fault in the stumping of the tree, did not absolve Nordling and Burchett from blame; nor was this the first tree they had stumped at the camp. Moreover, when they began work there camp No. 3 was already practically 100% unionized and had been since 1935. The rehabilitation of the local was apparent less in the pressing of grievances against the respondent than in the exaction of dues from the employees. And on the whole the circumstances said to point to the use of the stumped tree as a mere pretext might well have been thought insufficient to prove the charge laid. But these considerations have to do with the weight or preponderance of the showing; and we have concluded after a careful study of the record that there is evidence from which a discriminatory discharge might rationally be inferred.

It is inferable that Weiks was aware of the union activities of these men at the time of their discharge; and it is not irrational to believe that the resurgence of activity in the sub-local, attributable to them, was distasteful to the respondent. One piece of evidence, in particular, is of significance in this connection. About a week after the occurrence in question one Lovin was elected camp steward to replace Nordling. After Lovin's election, and after he had met with the management several times and had conducted a number of sub-local meetings, Barman advised him not to "stick his neck out," observing that he would not like to see Lovin lose his job. Lovin understood the remark as having reference to his activities as camp steward. Again, the Board was of opinion that Weiks and Barman had been less than frank in their testimony relating to the circumstances of the discharge, and for this as well as other reasons declined to give credence to their explanation. We may say, without going into the matter in detail, that the Board's skeptical attitude toward their testimony is not without basis in the record. Further, it was shown that other fallers at camp No. 3 had stumped trees without incurring so drastic a penalty; and that it was by no means the invariable custom of the woods for fallers to resign or be dismissed under those circumstances. Barman himself testified that Nordling "was not the worst faller in camp."

The Board concluded that respondent had engaged in unfair labor practices within the meaning of § 8(1) and (3) of the Act. It entered a cease and desist order, directed that Nordling and Burchett be offered reinstatement with back pay, and required the posting of the usual notices.

Decree will be entered enforcing the Board's order.