## NATIONAL LABOR RELATIONS BOARD v. SWANK PRODUCTS, Inc.

### No. 7051.

Circuit Court of Appeals, Third Circuit.

Dec. 29, 1939.

drews, Isadore Paisner, and Hinckley, Allen, Tillinghast & Wheeler, all of Providence, R. I., and Rawle & Henderson, of Philadelphia, Pa., for respondent.

Before BIGGS, MARIS, and BIDDLE, Circuit Judges.

BIDDLE, Circuit Judge.

The National Labor Relations Board found that Swank Products, Inc., the respondent, dominated and interfered with the formation of Swank Products Employees' Association, and ordered the corporation to cease and desist from these acts, to withdraw recognition of the association, and to post notices that it would do so.[1] This is a petition by the Board for enforcement of the order. The only material question before us is whether the Board's findings of fact, upon which its order is based, are supported by substantial evidence.[2] The relation of management to

Charles Fahy, Gen. Counsel, Robert B. Watts, Associate Gen. Counsel, Laurence A. Knapp, Asst. Gen. Counsel, Samuel Edes, and John H. Dorsey, all of Washington, D. C., for National Labor Relations Board.

Joseph W. Henderson, of Philadelphia, Pa., Chauncey E. Wheeler, Harold A. An-

[1] The order is as follows: "Upon the basis of the above findings of fact and conclusions of law, and pursuant to Section 10 (c) of the National Labor Relations Act, 29 U.S.C.A. § 160(c), the National Labor Relations Board hereby orders that the respondent, Swank Products, Inc., Attleboro, Massachusetts, and its officers, agents, successors, and assigns shall:

"1. Cease and desist:

"(a) From in any manner dominating or interfering with the administration of Swank Products Employees Association, or with the formation or administration of any other labor organization of its employees, and from contributing support to Swank Products Employees Association, or to any other labor organization of its employees;

"(b) From in any other manner interfering with, restraining, or coercing its employees in the exercise of the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection.

"2. Take the following affirmative action which the Board finds will effectuate the policies of the Act:

"(a) Withdraw all recognition from Swank Products Employees Association as a representative of any of its employees for the purposes of dealing with Swank concerning grievances, labor disputes, rates of pay, wages, hours of employment, or other conditions of employ-

ment, and completely disestablish Swank Products Employees Association as such representative;

"(b) Immediately post notices in conspicuous places throughout its plant and maintain such notices for a period of at least thirty (30) consecutive days stating: (1) that Swank will cease and desist as aforesaid and (2) that Swank withdraws and will refrain from all recognition of Swank Products Employees Association as a representative of any of its employees for the purpose of dealing with Swank concerning grievances, labor disputes, rates of pay, wages, hours of employment, and other conditions of employment and completely disestablishes it as such representative;

"(c) Notify the Regional Director for the First Region in writing within ten (10) days from the date of this order what steps Swank has taken to comply herewith; and

It is further ordered that the complaint insofar as it alleges that the respondent, Swank Products, Inc., has engaged in unfair labor practices, within the meaning of Section 8 (3) of the Act, 29 U.S.C.A. § 158(3), be, and it hereby is, dismissed; and

"Further ordered that the complaint, insofar as it alleges that the respondent, The Baer & Wilde Co., has engaged in unfair labor practices, within the meaning of the Act, be, and it hereby is, dismissed."

[2] That the respondent's operations bring it under the National Labor Relations Act is not disputed by respondent. On the evidence the Act is applicable.

874

the employees of the respondent has always been cordial, probably because labor standards were better than those generally prevailing in the industry. The toolmaking department, one of eight departments, was organized by the A. F. of L. in 1936–37, without opposition by the management, and all of the employees in that department were members of the A. F. of L. union. Respondent's employees did not strike when a growing attempt to organize spread to other shops. Negotiations resulted in a standard union contract for all the shops, including respondent's to which, however, the respondent's toolmakers objected. It contained conditions less favorable to them than those then prevailing with respect to hours, minimum wages, and overtime. Some effort was made later by the A. F. of L. to organize the jewelry establishments generally in the area, though not particularly the respondent's. Of respondent's employees who attended the organization meetings two joined the A. F. of L. union. One of them, Helen Robillard, claimed that she had been discriminated against during a six weeks' lay-off in June and July 1937. But the Board found against her, though ordering the disestablishment of the employees' association. There is no evidence of any hostility to organized labor on the part of the management, expressed in statements or otherwise. There is evidence of dissatisfaction among the employees as a result of the negotiations with the A. F. of L. union, which did not improve the condition of the toolmakers.

In April, 1937, soon after the organization of the respondent's toolmakers, Thomas Stevenson, a foreman and superintendent in charge of production, discussed with William MacClelland, in charge of the assembly department, the idea of forming an employees' association. Stevenson's job was to co-ordinate the work of the various departments. He did not have authority to hire or discharge employees, but occasionally selected them under the directions of Bagnall, the vice-president in charge of production. A small preliminary meeting at the respondent's plant was called on May 4, 1937, at which, in addition to Stevenson and MacClelland, six of the department foremen and a few employees were present. Stevenson and others expressed themselves as being in favor of an inside organization, and a vote of all but two who were present favored it. A few days later a committee from the meeting consulted Chauncey E. Wheeler, Esq., a lawyer who had represented the employers in the negotiations with the union, and who represents respondent in this proceeding, although he did not represent it at that time. Wheeler refused to act for the men, told them to call a meeting of all employees, to "get a charter and by-laws, and have an honest-to-goodness legal organization", and advised that Stevenson should take no active part in the organization. The employees were accordingly called to a meeting on May 14, held on the plant assembly floor, and 250 out of 350 attended. Several departmental foremen were present. Stevenson announced he would take no part in the organization, but did not leave the meeting. A committee was appointed with representatives from each department. Stevenson reported what had taken place to Bagnall. On May 19 and 20 a secret election was held at the plant on Company time. The Swank Products Employees Association was favored by a vote of 275 to 38. Solicitation for membership was thereafter carried on in the plant on company time without opposition from the management. When the complaint was filed the company asked to have the question resubmitted at an election held by the Board. But this the Board would not permit. A charter for the association was obtained, following the usual pattern, with dues at 25 cents a month and no strike fund. There have been no requests by the Association for a written contract.

The Act does not purport to prohibit plant, or so-called "company" unions, except where they are linked to the employer. That relationship does not arise from passive acquiescence of an employer, for acquiescence has none of the positive and aggressive quality contemplated by such words as "interfere", "restrain", "coerce", and "dominate", which we find in the Act.[3] The evidence in this case shows, we think, a genuine, if rare, attempt on the part of the employees to form their own intramural union, to prevent what they considered might be a less advantageous external organization bringing them to the lower level of competing shop conditions. This had been the experience of the toolmakers which employees in other departments did not wish to follow.

[3] 29 U.S.C.A. § 157, § 158.

Nor do we think that the acts of Stevenson and the other shop supervisors, in forming and trying to control the policy of the new Association, were tied to the management. They were acting, so far as the evidence shows, spontaneously and for themselves. Because men express dislike to organized labor does not, as the Board suggests in its argument, indicate that they must be acting for the management. We do not mean to say that agency must be established by proving a specific authority and a defined scope of action, as apparently was the basis of decision in Cupples Co. Manufacturers v. National Labor Relations Board, 8 Cir., 106 F.2d 100, 116.[4] Authority may be deduced from acts of the employer coupled with the type of the employee's authority, which make probable the link. But, as we have said, the company's acts here show nothing more than acquiescence in a course of conduct chosen by the men themselves. This conclusion is reenforced by a stipulation of counsel that members of the Association, if called, would have testified that they joined without interference or coercion and that their preference was for the Association, and not for either the C. I. O. or the A. F. of L.

The Board relies in main on Stevenson's supervisory powers; on his activity in organizing the association at the first meeting; and on the fact that the meetings were at the plant and on company time. But these things lose substance when they are realized against the web of other circumstances: that hostility to labor unions had never been shown by the management; that it had not discriminated against employees for joining the A. F. of L.; that no rival organization was in the field; and particularly that the toolmakers' contract with the A. F. of L. had made the employees skeptical of external organizations. The Board points to the shutting off of the power at the second meeting to permit the employees to attend as an act of interference by the management. But the evidence shows that the power was closed off after the meeting had started, as the employees could not hear what was going on. We do not think that the record sustains a finding of interference, domination or coercion.

The Board suggests that "mere attendance of supervisory employeees has repeatedly been held to reflect employer interference." But the two cases cited do not go so far. In National Labor Relations Board v. Wallace Mfg. Co., 95 F.2d 818, 820, the Fourth Circuit said: "There is evidence that the management of the mill was unfriendly to the union and friendly to the association *and* that some of the overseers attended the organization meeting of the latter. It was given the right to use the buildings of respondent for its meetings *although this privilege was denied the union * * *.* Several employees were given to understand that their jobs depended on their joining. * * * There is evidence that meetings of the union were spied upon * * * [emphasis supplied]." In Virginia Ferry Corporation v. National Labor Relations Board, 4 Cir., 101 F.2d 103, the record shows a plan prepared and put through by the management. The company owned two ferry boats. The crews had become dissatisfied with their wages. The two captains and the superintendent obtained the approval of the men in forming a grievance committee. Tickets were prepared for voting on it by the pursers with only the names of licensed officers of the vessels, though with a blank line to be filled in. The captain and the chief engineer and the purser of each boat were elected members of the committee. Unfriendly statements to the International Seamen's Union were shown to have been made by one of the captains and by the superintendent.

In National Labor Relations Board v. Eagle Mfg. Co., 99 F.2d 930, and National Labor Relations Board v. Falk Corporation, 102 F.2d 383, 385 in the Fourth and Seventh Circuits respectively, cited by the Board, the orders were based on evidence of active and aggressive interference by the employer, "evidence which is substantial [as contemplated by the Act], that is, affording a substantial basis of fact from which the fact in issue can be reasonably inferred * * * more than a scintilla

---

4 The court, however, did not wish to close the door, except on those facts, to a broader basis for proof of the authority. "There are, no doubt, situations where the relation of a supervisory employee to the employer is shown to be so close and his authority over the employees under him of such a character that a conclusion that he was acting for the employer, and not for himself or for his fellow-employees, in encouraging membership in one union and discouraging it in another, would be justified [citing cases]."

* * *" and doing more than creating "a suspicion of the existence of the fact to be established", unlike the case before us.

A case very similar to ours, in the Second Circuit, is Ballston-Stillwater Knitting Co., Inc. v. National Labor Relations Board, 98 F.2d 758, 761. It was decided as we decide this case. "Supervisory employees" had been active in the formation of an unaffiliated union. The court held that the association was "not the case of a 'company union' whose formation was initiated by the employer in order to combat the efforts of an outside union to organize his employees", but "was apparently the spontaneous reaction of a group of the employees * * *." This language characterizes the facts before us.

Our recent decisions in the Titan[5] and Griswold[6] cases dealt with records which by substantial evidence projected the management into the formation of the plant unions.

The petition of the National Labor Relations Board for enforcement of its order is accordingly refused; and a decree will be entered setting aside the order of the Board.

---

[5] Titan Metal Mfg. Co. v. N. L. R. B., 3 Cir., 106 F.2d 254.

[6] National Labor Relations Board v. Griswold Mfg. Co., 3 Cir., 106 F.2d 713.