**FOOTE BROS. GEAR & MACHINE COR-
PORATION v. NATIONAL LABOR RE-
LATIONS BOARD.**

**INDEPENDENT UNION OF GEAR WORK-
ERS v. NATIONAL LABOR RELA-
TIONS BOARD et al.**

Nos. 7088, 7252.

Circuit Court of Appeals, Seventh Circuit.
July 24, 1940.

Writ of Certiorari Granted Dec. 9, 1940.

See 61 S.Ct. 318, 85 L.Ed. ——.

Grier D. Patterson and George B. Christensen, all of Chicago, Ill. (Winston, Strawn & Shaw, of Chicago, Ill., of counsel), and Benjamin Wham and Edwin W. Burch, both of Chicago, Ill., for petitioners.

Charles Fahy, Gen. Counsel, Robert B. Watts, Associate Gen. Counsel, Malcolm F. Halliday, Asst. Gen. Counsel, Laurence A. Knapp, Asst. Gen. Counsel, and Allen Heald and Marcel Mallet-Prevost, Attys., all of Washington, D. C., for National Labor Relations Board.

Before EVANS, MAJOR, and TREANOR, Circuit Judges.

EVANS, Circuit Judge.

The proceedings before us were instituted for the purpose of setting aside an order of the National Labor Relations Board which covered the alleged anti-union labor activities of Foote Bros. Gear and Machine Corporation (hereinafter called the Em-

ployer). Both the Employer (No. 7088) and the Independent Union of Gear Workers (No. 7252) applied to this court for an order setting aside the order of the Board.

The Board answered and at the same time through a cross bill sought enforcement of its order.

The first complaint filed against the Employer was dated December 30, 1937, and amended January 5, 1938. It charged the Employer with a refusal to bargain collectively with the United Office & Professional Workers of America, Local No. 24* (hereinafter called the "U. O. P. W.") as the exclusive collective bargaining representative of the Employer's office and clerical workers (except engineers, draftsmen, outside salesmen, and supervisory employees who were not admitted to membership in the union) although the U. O. P. W. had been designated by a majority of such employees as their representative; that the Employer had discharged three of its employees, Theodore Rakowski, Raymond Hartman, and S. Rice, because they had joined and assisted in organizing the U. O. P. W.; and that the Employer had fostered, promoted, dominated, and interfered in the formation and administration of the Independent Union, and had entered into a contract with the latter, recognizing it as the exclusive bargaining agent of all of its employees, both in its shop and office.

The second complaint, issued January 25, 1938, was based upon charges filed by the Amalgamated Union of Iron, Steel, and Tin Workers of North America, Lodge No. 2048 (hereinafter called "Amalgamated"). It alleged that the Company had discharged Adolph Matoska because of his activities in joining, and assisting in the formation and organization of the Amalgamated, and further that the Employer had engaged in concerted activities designed to discourage membership in the Amalgamated.

The Independent Union was granted leave to intervene as to matters affecting its interests, and, subsequently, the cases based upon the two complaints were consolidated for the purposes of the hearing, which was held in Chicago, commencing January 10, 1938.

The examiner filed his intermediate report on March 28, 1938, and subsequently, on August 24, 1939, the Board handed down its decision and order.† The order called for the Employer to cease and desist from: (a) Dominating or interfering with the administration of the Independent or any other labor union of its employees, or contributing to the support of such union or unions; (b) encouraging or discouraging membership in any labor organization of its employees, including the Amalgamated, by discharging or refusing to reinstate employees; (c) giving effect to the collective bargaining contract entered into with the Independent Union; (d) refusing to bargain collectively with any bona fide labor organization of its employees properly designated by them as their representative; (e) in any other manner interfering with the rights of its employees in the exercise of their right to self organization.

The order also called for the Employer to take affirmative action: (a) Withdraw all recognition of the Independent as the representative of its employees for the purpose of collective bargaining; (b) pay to each person in its employ after May 28, 1937, an amount of money equal to the sum of all the dues deducted from the wages and salaries of such persons since May 28, 1937, on behalf of the Independent Union; (c) offer to Theodore Rakowski and Adolph Matoska and to each of them full and immediate reinstatement to their former or substantially equivalent positions without prejudice to their seniority or other rights with back pay, less what they have earned in the meantime; (d) post, as amended, appropriate notices.

The complaint of December 30, as amended, in so far as it alleged that the Employer engaged in unfair labor practices in refusing to bargain collectively after June 1, 1937, with the U. O. P. W. was dismissed. It was also dismissed in respect to the discharge of Raymond Hartman and S. Rice.

Employer is a Delaware corporation licensed to do business in the state of Illinois, and also in Minnesota and Texas. It maintains a plant in Minneapolis and one in Chicago. The proceedings here concern only the latter. It was incorporated, December 2, 1935. Prior to December, 1932, its business and properties were owned by Foote Brothers Gear and Machine Company, an Illinois corporation. It went into

---

* The complaint stated the U. O. P. W. had formerly been known as the Stenographers, Typists, Bookkeepers & Assistants Union, Local #20074, and also as the Chicago Office Workers Union.

† 14 N.L.R.B. 1045.

receivership in December, 1932, and was subsequently reorganized. Since March 13, 1936, when the reorganization was consummated, it has been the Company against which the complaints, here involved, were issued.

■ Employer is engaged in the manufacture of gears, speed reducers, machinery, and other special products, produced chiefly to customers' specifications. For the fiscal year ending October 31, 1937, its sales of finished products amounted to approximately $2,004,000, of which about $1,900,000 was shipped to customers outside of the State of Illinois. During this period, it purchased approximately $950,000 worth of raw materials for use in its regular course of manufacture, of which about $500,000 worth was purchased outside the State of Illinois. The Act is, we think, clearly applicable to the Company and its employees. Section 10(a), National Labor Relations Act, 49 Stat. 453, 29 U.S.C.A. § 160(a); National Labor Relations Board v. Jones & Laughlin Steel Co., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352; Santa Cruz Fruit Packing Co. v. National Labor Relations Board, 303 U.S. 453, 58 S.Ct. 656, 82 L.Ed. 954; National Labor Relations Board v. Fainblatt, 306 U.S. 601, 59 S.Ct. 668, 83 L.Ed. 1014.

The issues raised here are: (1) Did the Employer indulge in unfair labor practice by dominating and interfering with the formation of the Independent Union within the meaning of Section 8(1), (2) of the Act? (2) Did it discriminate against the Amalgamated by the discharge of Adolph Matoska for union activities within the meaning of Section 8(3) of the Act? (3) Did the Employer unlawfully discharge Theodore Rakowski for union activities within the meaning of Section 8(3) of the Act? 29 U.S.C.A. § 158(1-3).

The Board based its order upon findings to the effect that (1) the Employer's policy before May, 1937, was anti-union, and this policy was impressed upon its employees; (2) the Independent Union was formed with Employer's aid to forestall the attempts of the S. T. B. A. and the Amalgamated to organize the men; (3) the Independent was deliberately recognized as the exclusive bargaining agent of the office and clerical employees of Employer because of the efforts of the S. T. B. A. to secure an exclusive bargaining contract with the Employer. At the time of recognition, the Independent had no members in the office;

(4) Rakowski was discharged because of his "dangerous activities" on behalf of the S. T. B. A.; (5) Matoska was discharged because of his leadership in the Amalgamated, and his "dangerous activities" in its behalf. Both Rakowski and Matoska, the Board alleges, were outspoken in their contempt for the Independent as a bona fide labor organization, and were eliminated before they could do further damage to the reputation of the Independent.

Petitioners deny there is substantial evidence to support these findings, and assert that the evidence clearly shows that the management pursued throughout the entire period, "a hands off" policy toward the organizational activity of all groups, including the S. T. B. A., the Amalgamated, and the Independent, and at all times entertained and evidenced a neutral attitude to their employees with regard to controversial union subjects. They further insist that the Independent is not Employer-dominated, but that, instead it was of voluntary origin. It was freely selected by an overwhelming majority of the employees as their bargaining agent and was recognized as such by the Employer because of the provisions of the National Labor Relations Act which dictated their action. They also assert that Rakowski and Matoska were both laid off, for just causes.

■ Bearing in mind the limited jurisdiction of this court in reviewing the evidence (Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126; National Labor Relations Board v. Columbian Enameling and Stamping Company, 306 U.S. 292, 300, 59 S.Ct. 501, 83 L.Ed. 660; M. H. Ritzwoller Company v. National Labor Relations Board, 7 Cir., May 8, 1940, 114 F.2d 432; Fort Wayne Corrugated Paper Company v. National Labor Relations Board, 7 Cir., 111 F.2d 869, we search the record to determine whether the necessary quantum of supporting evidence can be found to sustain the Board's findings.

On May 1, 1937, 355 persons were employed at the Chicago plant, of which 280 worked in the shop and 75 in the office. Both the shop and the office forces are largely made up of highly skilled specialists. In the former are many skilled mechanics and machinists, and in the latter there are many engineers and draftsmen. Men are often shifted from department to department, both in the office and in the shop.

In 1934, with the inauguration of the National Industrial Recovery Act, 48 Stat. 195, the employees in the *shop* became interested in organizing a union. A union to be affiliated with the American Federation of Labor was first contemplated, and a circular to this effect was passed among the men. About this time, a meeting was called (it is not clear by whom it was called) among the shop men. Both William Barr, then superintendent, and Franklin Harper Fowler, president, spoke to the men. There is some controversy as to just what these officials said. Barr testified that he told the men that the business was "in a very, very bad shape," and that "every man in it would have to buckle down to his work and give every bit that he could to the management." Two other witnesses, Stout and Matoska, testified that Barr also said something to the effect that he didn't care which way the men went (in organizing) but that they should make it 100%, as he didn't want any trouble. Fowler is reported to have said, that he would never deal with outside unions. This, he denied at the hearing. There is also evidence to the effect that Fowler mentioned the possibility of forming a union without paying any dues. This was back in 1934.

In any event, the men "talked it over," and, after contacting a business agent of the American Federation of Labor, who told them that the monthly dues would be $7.50, which seemed high, as "there was not much steady work," an election was held the following day to determine the type of organization the shop would have. As a result of the election, a company representation plan was set up. It began to function sometime *in April, 1934.*

This representation plan did not require dues. Yearly elections of committee men were held, and this committee met twice monthly with the management to settle grievances and other problems, including hours of work, etc. This plan continued to function, although after the National Industrial Recovery Act was declared unconstitutional, interest in the plan fell off. When the National Labor Relations Act was finally upheld by the Supreme Court, April 12, 1937, the management consulted its attorneys. On May 6, 1937, Barr called a meeting of the plan's committeemen and read to them a statement which had been prepared by employer's counsel.

The statement declared that the management had been informed by its counsel that, under the Wagner Act, the representation plan was legally entitled to recognition if it was supported by a majority of the employees involved, but that certain organizational defects existed concerning which the employer could not advise its employees. It was suggested that a competent lawyer of the employees' own choosing be consulted.

Barr stated that he refused to make further comments to the men at this time concerning future organization in the shop, and that he instructed his foremen to keep their hands off and to keep out of all controversies. However, no organizing was to be allowed during working hours.

Carl Egner, a shop employee and former chairman of the representation plan committee, testified that after Barr had read the prepared statement to the committeemen, the men talked things over, and, he said:

"We found out that the only thing we could do was to seek advice from the outside as to what we could do, and we knew from the feeling, being committeemen, that the majority wanted to be independent of any outside organization. That was the feeling at the time. There had been talk all through the shop; we, like everybody else, read the papers, found out there was a lot of labor trouble in different places, and different groups get together and talk and we thought the thing to do was to be by ourselves."

Egner and three other members of the now defunct plan committee apparently took it upon themselves to take the initiative in forming a new union. Some friend or acquaintance mentioned the name of an attorney, Wham, to Egner, although another attorney had been suggested. It was learned that Wham had set up an independent union at the Chicago plant of Link Belt Company. Accordingly, Egner and four committeemen went to Wham's office, Saturday, May 8. There, after considerable discussion, it was decided to form the Independent Union. Wham drew up a constitution. Membership forms were obtained. The following Monday, Egner, six other former committeemen, and one other employee, started to campaign for members. Here again the evidence becomes somewhat confused and indefinite. However, it appears that Monday, Tuesday, and Wednesday, May 10, 11, and 12, were spent in more or less active campaigning. Egner testified that this was done under cover. A man would be approached here

and there, at off moments, and asked to join. Heberlein, one of the campaigners, testified:

"There were rumors through the shop that we were organizing an Independent Union. * * * I explained that our Union (representation plan) was no good. * .* * They were willing to sign."

The foremen of Employer, Rassau, Mackmann, and Schuessler, testified that they broke up gatherings whenever formed by the men as quickly as they could. These men evidently sensed what was in the air, but faithfully endeavored to keep the men at their work and to avoid partisanship in union matters.

By Wednesday or Thursday afternoon the organizers had 210 signed membership cards—a clear majority of the 280 shop employees, and also of the entire company of 355 employees. However, at this point, no solicitations for membership had been made among the office employees.

Thursday afternoon, after work, a meeting was held in a hall hired for the purpose. All of the shop men were invited and about a hundred appeared. Egner presided. Wham, the attorney, explained the National Labor Relations Act generally. The constitution drawn the previous Saturday was adopted, and by-laws were prepared. These provided for admitting into membership all employees of Employer except those occupying a supervisory capacity. Officers were elected. Egner became president; Miller, vice-president; and Shaffran, secretary and treasurer. Neither of the last two named had been committeemen of the representative plan.

The following morning, Friday, May 14, Egner requested a meeting with Fowler. At the meeting, Egner demanded recognition for the Independent as the exclusive bargaining agent of the Company's employees. He presented a simple form of recognition agreement which Wham had prepared. Also submitted were the signed membership forms. Fowler, however, refused to sign immediately. He wanted to check the applications for membership with the payroll. Fowler then consulted his attorney, who suggested that he bring the recognition agreement down to his office to check. This, Fowler did. Minor changes were suggested which were agreed to by Wham over the telephone. Fowler next contacted his directors (two were out of town and had to be reached by long distance telephone) after he was informed by Fagan, company treasurer and secretary, that the application signatures of the Independent, checked with the payroll, showed a clear majority. Fagan said it would require several days to check the authenticity of the signatures, which would have to be compared one by one with those on the payroll. Instead, Egner gave an affidavit to the effect that all of the signatures were genuine. Then, having obtained the consent of his directors, Fowler signed the recognition agreement. His attorney had advised him that under the Wagner Act, where satisfactory proof of a majority was presented, there was no alternative but to sign.

Meanwhile, during April, 1937, the S. T. B. A. had been trying to organize the Employer's office employees. This union, affiliated with the A. F. of L., admitted to membership all office and clerical employees except supervisors having the power to hire and discharge, engineers, draftsmen, and outside salesmen. According to the testimony of the Union's business manager and organizer, Miss Sandra Slotkin, organization work took the form of holding meetings for the employees in various places in Chicago and meeting with and talking to individuals. By May 4, 1937, Miss Slotkin testified that she had received 33 signed application cards. Excluding the Employer's supervisory employees, engineers, draftsmen, and outside employed salesmen, there were 54 office and clerical workers (as distinguished from shop workers). Miss Slotkin therefore asserted that her union had a majority of members in an appropriate unit.

Accordingly, on May 4, Miss Slotkin came to see President Fowler at his office. Unable to see him on the first visit, she arranged a meeting for May 7, which she could not attend and it was postponed to May 10. She then presented a contract under which the S. T. B. A. was to be recognized as the exclusive bargaining agent for the office and clerical employees. It was to be a closed shop. A blanket wage increase of 20% was demanded, time and one-half pay for all overtime work, and elaborate provisions for handling grievances were also included.

President Fowler requested time to think the matter over and to consult his directors, before giving any definite answer to the proposals. Miss Slotkin refused to give up the signed membership applications when requested that they might be checked with

the payroll. However, she showed a willingness to deliver them to a conciliator or representative of the Department of Labor for the purpose of checking. After a somewhat general discussion of wage rates, etc., the meeting was adjourned until May 14. Patterson (attorney for Fowler) and Fowler studied the S. T. B. A. proposals the following day. Modifications and counter proposals were drawn up. The meeting of May 14 was postponed by Fowler until May 17, "due," he said, "to the absence from the city of an official who must be consulted."

Fowler told Miss Slotkin of the recognition of the Independent at the May 17 meeting. He also presented her with the counter-proposals and modifications which he and Patterson had prepared. The reason given for this conduct, Fowler explained, was that his action was taken to prepare for future discussions, should there ever be any between the Employer and the S. T. B. A. This was possible, he thought, in the event that the National Labor Relations Board designated a group of the office and clerical employees (such as the S. T. B. A. admitted to membership) as the appropriate classification for a bargaining group.

Sometime in June, 1937, the American Federation of Labor revoked the charter of the S. T. B. A. For several weeks thereafter the organization had no national affiliation. It was known as the Chicago Office Workers Union. Finally it affiliated with the Congress for Industrial Organization under the name of United Office and Professional Workers of America. Miss Slotkin explained at the hearing that all members of the S. T. B. A. were sent cards explaining the situation. Those not desiring to be considered members of the new organization were asked to notify the U. O. P. W. office. Silence on the part of S. T. B. A. members signified consent to the change. However, at least seven former members of the S. T. B. A. testified that they never received any such cards or considered themselves to be members of the U. O. P. W.

The Board found that the Independent was illegally dominated and fostered by the Employer. It was accordingly ordered disestablished as the representative of the employees.

This finding has slim support.

■ The record is barren of substantial evidence to support it. Before the Jones & Laughlin Steel Company decision was handed down by the Supreme Court, April 12, 1937, representation plans such as the one in operation in the Employer's plant were common throughout the country. Their prior existence and subsequent dissolution are not, per se, an unfair labor practice. Nor is it evidence of such an anti-union attitude on the part of the employer that it may be said to constitute coercion of the employees within the meaning of the Act. As was said in Greif & Brothers v. National Labor Relations Board, 4 Cir., 108 F.2d 551, 557:

"The strength of the Board's position lies in the fact that the management took the initiative in calling the employees together and announcing the disestablishment of the old association of the workers and the impropriety of its further use as a bargaining representative; but the disestablishment and the denial of recognition of an inside union, improperly favored or dominated by the employer, is in harmony with the statute and conforms with the announced policy of the Board. The strength of the Company's position is that it declared the disestablishment of the old association and answered the questions of the workers quite publicly in the presence of responsible and disinterested members of the community; but this of itself is not conclusive. * * * It is not an answer to point to circumstances indicating that the management preferred an inside to an outside union, or that citizens in the community entertained a hostile feeling toward the Amalgamated. It goes without saying that the determination of the employees to form their own association and to be free from the outside interference of a national union was influenced by their past experience in the plant, * * * but these contacts did not deprive them of their rights under the Act, or require them to choose bargaining representatives offensive to their employer or to their fellow citizens, so long as their choice was not dominated or interfered with by the employer."

Compare National Labor Relations Board v. Newport News Shipbuilding & Dry Dock Co., 308 U.S. 241, 250, 60 S.Ct. 203, 84 L.Ed. 219.

■ There is no justification for the finding that the Independent Union was fostered and dominated by the Employer. Rather, the contra appears. The evidence shows that the Employer, as nearly as was humanly possible, maintained a truly "neu-

tral" as opposed to a "non-belligerent" or "belligerent" policy. The S. T. B. A., the Amalgamated, and the Independent, all solicited members during working hours and on company time. The foremen knew that this was going on, and, upon orders from the management, tried to stop soliciting, or campaigning, whenever they found employees engaging in it during working hours, regardless of the organization concerned. No disciplinary measures were taken against the organizers when their activities were discovered by the foremen. This much is undisputed.

The Board cited five examples wherein several of the men were questioned by Barr, Fowler, and other company officials concerning union activity in the plant. In four of the cases, mere inquiries were made, according to the men's own testimony: (1) Barr asked Nicoll if he was a member of the American Federation of Labor. Nicoll acknowledged that he was. He was not discharged nor discriminated against in any way. (2) Rakowski said Emmons asked Hill if he was a member of the S. T. B. A. (Emmons was a supervisor in the office). (3) Emmons said to Doolin, "We understand that there is a C. I. O. Union being organized. What do you know about it?" Doolin testified that he replied that he knew nothing about it and that "that was all there was to the conversation." (4) Fagan asked Rice if he had heard anything about a union being formed. Rice replied that he had heard something several weeks prior thereto. He was not even asked if he were a member. (5) Rakowski testified as follows:

"After I joined the S. T. B. & A. U.; I had a talk with Mr. Fowler about unions. That was on the date that the company found out about our union, on April 29 or 30. I went to see him because I found a note by Emmons requesting that I see Fowler. Fowler told me that the company had learned that a union was organized amongst the employees and asked me if I had heard anything about it, and if I had joined it. I told Fowler that there was such a union but that I was not a member. He told me that unions are nothing but a bunch of rackets, controlled and dominated by racketeers and gangsters and other persons of questionable character. He said that when a union went into an agreement with the company the individuals had no right to bargain individually, but that any difficulties that might arise in their work would all have to be thrashed out between the company and the union, and that that was a bad situation. I nodded my head in approval of what Mr. Fowler said and then we discussed a business matter. We did not have any other discussion concerning unions that I recall at that time."

■ In an affidavit previously taken, Rakowski described his meeting with Fowler in the following language:

"On or about April 30, I happened to be in the plant and when I returned to my desk, found a note (written) by Mr. Emmons, my superior, on my desk, instructing me to see Mr. Fowler as soon as I got back, which I did. I went to the President's office and he asked me point blank if I belonged to the union (or if I knew anything about it) and I, in order to protect my job, lied and said I did not. I also told him that I had heard of a union being organized in the (office). I then also thanked him for not asking me who it was that approached me regarding joining the union. That is all I said about Unionism. We then discussed a business matter and I left his office."

The variance in the two Rakowski statements weakens his testimony especially that which deals with Fowler's theories on unionism. It is our conclusion that the management did not coerce or intimidate its employees in respect to their union activities by the questions it asked them.

■ The Independent was quickly formed, and promptly recognized by the Employer. To this, in itself, there can be attached no stigma of unfair labor practices. If the Independent represented a majority of the employees, it was the statutory duty of Employer to recognize it. Egner's active participation in the affairs of the Independent is cited by the Board as evidence that the former was merely a continuation of the representative plan because Egner had formerly been a leader of it. Such a conclusion is unwarranted. It is natural for a man who is active in union affairs to continue such activities because of his liking for them. The end of the representation plan did not change Egner's personality, his ability, or his views. Furthermore, Vrba, Matoska, and Stout were all members of the representation plan committee. They became leaders in the Amalgamated. Yet, from such fact the Board draws no inference that the Amalgamated was merely a continuation of the plan.

Once organized, the Independent became active in its fight for better working conditions, hours of work, and rates of pay. In short, it did everything for its members that any union might legitimately do. It succeeded in its negotiation with Employer. It obtained the check-off, wage increases, a minimum wage guarantee, provisions for the rotation of work when business was slack, and improved working conditions generally throughout the plant. Provision was made for the handling of individual grievances as they arose. A closed shop provision was demanded by the Independents, but this was refused. On May 28, an exclusive bargaining contract was signed. It was without a fixed duration and could be terminated by either party on the first of May of any year upon adequate notice.

We are persuaded that the record before us shows one of those "genuine, if rare, attempt on the part of the employees to form their own intramural union, to prevent what they considered might be a less advantageous external organization * * ." National Labor Relations Board v. Swank Products, 3 Cir., 108 F.2d 872, 874; Link-Belt Co. v. National Labor Relations Board, 7 Cir., 110 F.2d 506.

■ The Act does not compel employees to affiliate with any particular union, national or otherwise. It does not prevent them from forming truly independent unions of their own choosing. National Labor Relations Board v. Brown Paper Mill Co., 5 Cir., 108 F.2d 867, 870.

Theodore Rakowski was discharged, or laid off, June 11, 1937. He was an operator in the office, and also had charge of answering all inquiries of customers concerning shipments of their orders. The Employer says his lay-off was due to business conditions. The Board, on the other hand, finds it was because of his activity on behalf of the S. T. B. A.

It was admitted that he was active in that union. The evidence also shows that the Employer's business decreased between May 8, 1937 and January 7, 1938. During this period fifteen office employees were laid off, and no new ones were hired in their places. The "Statement of Orders Booked" shows a steady decline in both "contract" and "non-contract" orders. In June, 1937, the total bookings were $145,071. In January, 1938, they were $98,615.

■ Significantly, the two men who took over Rakowski's work, Fajnor and Fisli, were both members of the S. T. B. A., although they subsequently joined the Independent Union. In addition to this, they both outranked Rakowski in seniority. Rakowski himself testified that his superior, Emmons, attempted to get him a position in the sales department of another concern. Emmons went to considerable trouble to do this, and the attempt was dropped only when it appeared that Rakowski would have to go to New York, which he did not want to do. This showing fails to support the finding that Rakowski was discharged because of his activities on behalf of the S. T. B. A.

During May and June, 1937, the Steel Workers Organizing Committee began organizing the Employer's shop employees. As has already been noted, some of this solicitation was carried on, along with that of the S. T. B. A. and the Independent, during working hours. Thereafter, in November, 1937, the Amalgamated was organized as the local affiliate of the S. W. O. C. A meeting of the members was held on November 6. Stout was elected President and Matoska, Vice-President. The following week, Matoska and some 30 or 40 other Amalgamated members wore their union buttons to work. These buttons bore the following legend: "Steel Workers Organizing Committee, Dues Paid for November, 1937." It appears that Superintendent Barr came through the shop on November 9 and there conversed with Matoska, at his machine about his work. Only a few of the men, Matoska testified, wore their union buttons while Barr was in the shop, and Matoska was one of those few. The evidence is conflicting as to whether Barr saw Matoska's button. Barr denied that he had, but in Matoska's opinion he did see it. The Board was satisfied that he did "take a good look at it."

At any rate, the following day, Matoska was standing in the shop talking to his fellow employee, Stout, allegedly about their work. Rassau, a general foreman, ordered Stout back to his own department and then complained to Gronski, Matoska's foreman, about his allowing the two men to visit together in his department. Matoska testified as follows as to what happened thereafter:

"With reference to this difficulty with Rassau, after he talked to Gronski I went to Gronski and said 'Did John say anything about me?' He said, 'He told me to

keep you guys from piling up.' I said, 'For heaven's sake I was there just three seconds just to pick up my stuff.' After two minutes I kind of thought it over and I said to myself I better go and ask Rassau what is wrong. He was talking to a man on the boring machine, next to me. I was waiting until he got through talking to the man, giving orders, and I said, 'John, what is wrong?' He hollered at me, 'Plenty' and I said, 'Just a minute, that is not an answer. I did not come here for an argument.' He said, 'You are supposed to stay on your job.' I said, 'That is exactly what I am doing; even more than that. Furthermore, I understand you are foreman up there on the turning; don't you think you are supposed to watch your men?' He says, 'What do you want me to do, to go to Barr's office and get you a discharge card?' I said, 'Go ahead, if you feel that way about it.' He left me swearing. This was about 2:30 in the afternoon of November 10, 1937. That was the end of it then until I was called into Barr's office. In five minutes, possibly, Mr. Kitt came to me and told me that Mr. Barr wants to talk to me. I came to Barr's office and he handed me an envelope with two checks and said, 'Adolph, you are discharged for insubordination.' I said, 'Thanks, Mr. Barr, but I am going to fight for my reinstatement.' That is all the conversation Barr and I had."

Rassau and one other witness testified that Matoska was angry when he talked to the former, that he raised his hand and pointed his finger at Rassau. Matoska answered this by the statement that "maybe while talking with him I got a habit of gesturing with my hand." However, he said "it is a lie that I was just going to slap him down with the broad of my hand."

In any event, shortly after this incident, Matoska was called into Barr's office and informed that he was being discharged for insubordination. Matoska merely stated that he would fight for reinstatement. He testified at the hearing: "I don't think Barr gave me a dirty deal at all. I think that Barr treated me fairly and that he was misinformed by someone else." Rassau testified, however, and the counsel for the Board appeared to accept his testimony in their brief, that he did not recommend that Matoska be discharged. He merely reported the incident to Barr.

It is hardly understandable, in the light of this showing, how the Board reached the conclusion that Matoska was discharged because of his activity on behalf of the Amalgamated. If this were true, why was Stout not discharged also? Presumably he was a more influential union man because of his position as president of the Amalgamated, than Matoska, and he had been found out of his department by Rassau. Kocic, Stout, Vrba, Toffel, and others wore their S. W. O. C. buttons when Barr was in the shop, yet only Matoska was discharged. Other members of the union had been as active or more so, in organizational work.

The Board, in summarizing the entire matter, said:

"We do not think it necessary to determine to what extent the conversation between Matoska and Rassau was a heated one, and where the fault lay. We are satisfied, and find, that the occurrence was not the true cause of Matoska's discharge. It is significant that Rassau who reported the incident neither expressed an opinion, nor recommended to Barr, Matoska's dismissal. We find that the incident, like the lay-off of Rakowski, was merely a pretext seized upon by the respondent, through Barr, to rid itself of another employee who had shown himself unwilling to yield to its policy of hostility toward 'outside' labor organizations."

It is significant that nothing appears which would explain the Employer's discharge of Matoska, alone, because of his union activity. Others known to be active members of the same union, including the Amalgamated president, Stout, were never discriminated against in any way. Then, too, if we accept Matoska's version of the discharge, he offered no explanation, made no statement, merely observed he would seek reinstatement. He made no attempt at any other time, to justify his conduct, or to plead for his job. The conviction which he subsequently developed, namely that he was discharged for union activity, appears to have been an after-thought. The Board's observation that Barr never consulted with Gronski, Matoska's foreman, is answered by the fact that Gronski did not witness the occurrence. He was not present, and there was nothing about which he might be consulted.

It might be added that if the Employer desired to rid itself completely of the unwelcome union activity concerning which the Board speaks, it could have done so easily and in a legal manner. A closed

shop agreement, effected with the Independent Union, would have effectively precluded any further organization on the part of the Amalgamated. The Independent strenuously urged the adoption of such a contract, but Employer rejected the proposal.

Such action on its part is consistent only with Employer's assertion that it was neutral in fact, and at all times impartial in its attitude toward all unions.

The Board argues that we are not permitted to examine or weigh the evidence or analyze a finding by it made which is supported by substantial evidence. On the extent of the application of this rule the outcome of this case largely turns.

■■ Undoubtedly the rule is well established that a finding by referee, trial court, or administrative board if supported by substantial evidence should be accepted by an appellate reviewing court. This does not relieve the appellate court, however, of the duty of examining the evidence to ascertain whether the finding is supported by evidence. And an examination of the evidence necessitates an analysis which to a certain extent is a weighing of such evidence. In fact, the court's duty to make this examination and analysis of the evidence is quite as clear (even though more burdensome and involves the tedious study of testimony and witnesses' qualifications and biases, etc.) as the construction and application of statutes or any other legal question. Evidence, to be substantial, "Must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." National Labor Relations Bd. v. Columbian Enameling & Stamping Co., 306 U.S. 292, 300, 59 S.Ct. 501, 505, 83 L.Ed. 660. Following are a few of the cases where the application of this rule was under review: Randall v. Baltimore & O. R. Co., 109 U.S. 478, 3 S.Ct. 322, 27 L.Ed. 1003; Robinson v. Denver City Tramway Co., 8 Cir., 164 F. 174; Patillo v. Allen-West Comm. Co., 8 Cir., 131 F. 680; Bell v. Carter, 8 Cir., 164 F. 417, 19 L.R.A.,N.S., 833; Richards v. H. K. Mulford Co., 6 Cir., 236 F. 677; W. J. Doye Lbr. Co. v. Pennsylvania R. Co., 8 Cir., 10 F.2d 437; Pennsylvania R. Co. v. Chamberlain, 288 U.S. 333, 53 S.Ct. 391, 77 L.Ed. 817.

In making this study we assume there is a difference in the scales used in the grocery stores to weigh groceries and the human scales often referred to, which record the weight of evidence. In the case of the former, mathematical certainty is obtainable or at least approachable. If the quantity of vegetables falls short of the desired amount, the salesman adds more. Not so with testimony. M testifies that he was discharged because of union activities. This, we are told, is sufficient to sustain a finding of the Board to the same effect. More testimony need not be sought or given. But unfortunately the positive testimony thus given may melt and become less certain when mixed with other evidence. Unlike groceries, where larger volume means more weight, here sometimes additional facts detract from the weight of M's statement of a single fact.

Employer's statement that it did not discharge M because of union activities does not raise a very serious fact issue. It still could be said that the finding is supported by evidence. If, however, it appears further that M's successor was a member of the same union, the weight of M's testimony begins to melt. Add to this the further fact that other men were discharged and, in making the discharge, the employer acted, as in M's case, always on the basis of seniority, and never because of union membership, then M's testimony approaches the scintilla dimensions.

■ Analyzing the testimony one finds it is not strictly a factual statement. It is the statement of a factual conclusion which reflects the speaker's opinion and is somewhat colored by his prejudice. It might be somewhat appropriately described as the shadow of a fact, or two or more facts. The color, form and size of the shadow depend somewhat on the viewpoint of the witness and the color of the glasses he wears. Had the Employer's superintendent and M testified oppositely respecting M's attendance at a meeting, a factual dispute would exist, but where, as here, M testifies as to Employer's *motive* which he says was based on its prejudice against the activities of union members and the Employer's superintendent denies it and points to a consistent record with other union employees, no factual controversy exists. Rather is it a case of conclusions from facts, the determination of which is not within the exclusive function of the fact finder. It is subject to study, analysis and rejection by an Appellate Court.

■ Deference we should, and do, show to a fact finder, be he a judicial or

administrative board official, but slavish devotion to the words (but not the spirit) of a rule can never satisfy the responsibility of a reviewing court charged with the duty of forming an independent judgment on the sufficiency of the evidence (which is not purely factual in character) to support a finding.

As this issue seems to be the heart of the controversy and its correct solution the sharply determinative question on this hearing, we have rather extendedly stated the facts. Avoidance of tedious length has been impossible.

■■■■ In reaching our conclusion we wish to make it clear that (a) a finding by an examiner will be accepted when substantial (although contradicted) evidence supports it. (b) This rule (a) does not relieve us of a duty to examine the evidence and analyze and distinguish, when necessary between the factual and conclusion statements of a witness. (c) A statement which alone may afford substantial support for a fact finding may lose its weight entirely in the face of uncontradicted facts inconsistent with it. (d) Statements which are witness' mental deductions from physical facts weaken and sometimes lose their entire probative force in the face of undisputed facts which are irreconcilable with the deductions of said witness. (e) The burden of proof of Employer's discharge of M because of union activities was on the Board.

■■■■ We conclude that the finding that Matoska was discharged because of his union activities is not supported by substantial evidence and is contrary to the fact. National Labor Relations Board v. Asheville Hosiery Co., 4 Cir., 108 F.2d 288, 290.

On the question of Company domination of the local union, we confess our study of the evidence is from a somewhat different approach than that taken by counsel for the Board.

The Act we are called upon to enforce provides, *as its primary objective,* for the right of employees to bargain collectively and to unite in organizations for this purpose. And this right would be of no value if they were not also given the right to act *freely;* that is, make their own choice —uninfluenced from without. In short, employees are here given the right to freely choose any agent they wish to bargain for them in matters of wages, hours of labor, conditions of work, and to represent them in other matters of great importance to them.

In the record before us there are a few verities. Among them are: There are 355 persons employed in the Chicago plant. 280 of them worked in the shop. 75 were office employees. The groups were separated by the Board for bargaining purposes into two units. Of the 280 shop employees (they were all of the skilled class) 210, exclusive of officers, united to form and did organize the petitioner herein, Independent Union of Gear Workers.

In other words, over 75% of all shop employees joined this organization. They evidenced their desires and convictions in writing. They elected their officers and of their employer demanded recognition. They made demands which evidenced no servility or slavish obeisance to a superior. They demanded minimum wages, increase in wages, check-off, provisions for handling individual grievances. They also sought a closed shop. Significant it is that they were successful in all their demands save the last one.

It is this group, comprising more than three-fourths of the employees, whom we are asked to turn out and disorganize. The controversy is not between Employer and employees. It is one between the employees and the Board. The real issue is the survival of the union which 75% of the employees organized and selected as their bargaining agency.

What is the evidence upon which disorganization is sought?

The employees deny their union was brought into existence by their employer; they resent the implication that they are a stooge for their employer and merely the latter's voice in matters which affect the wages, health, and welfare of themselves and their families.

Not only have they expressed their preferences in writing, but we have the oral statement of their members and officers who deny interference or coercion by Employer. Surely the wishes of more than 75% of the employees, when freely and intelligently expressed, should not be lightly ignored, either by this court or the Board.

Nor can we ignore the testimony of the officers of the Employer. They assert they consistently pursued a neutral course, favoring no union—yet objecting to none.

To say that Employer exercised no influence over the employees would be inaccurate. For it must be assumed that Employer's wishes, expressed or not, would be considered and weighed by faithful employees. Quite similar must be the reaction of an employer who takes his responsibilities seriously when considering action affecting its employees. It is not this influence at which the Act aims. It is the undue, the improper, influence, which is evidenced by interference of a coercive character, which is condemned by the Act,—as it is condemned by intelligent public opinion. It is of this influence we speak when we say that there is no substantial evidence which supports the finding that the employees were unduly influenced or coerced by the Employer in the selection of the bargaining agent or in the creation of petitioner, Independent Union of Gear Workers.

The Board has found that throughout May, 1937, the office and clerical employees of the Chicago plant, excluding engineers, draftsmen, outside salesmen, and supervisors, constituted a unit appropriate for the purposes of collective bargaining. Viewing this finding in the light of the history of the Employer's union activity, and bearing in mind the differences between the office and clerical employees and those excluded from the unit, it appears to be reasonable and proper.

Nor can it be said that it is unsupported by the evidence. The representative plan was for the shop. At the time that the Independent Union was recognized by the Employer, not one office employee had been asked to join. The office workers had had nothing to say about the organization or the form of the Independent. The fact that subsequently the Union seemed to be working out satisfactorily so far as the office workers were concerned hardly justifies us in overthrowing the Board's finding, in view of all of the evidence. The Board made no order in respect to this finding. We feel justified in expressing our views on this question, nevertheless, because of possible future activities of employees of this group.

The petitions of the Company and the Intervenor seeking the vacation of the Board's order are granted. The petition of the Board for enforcement of its order is denied.

TREANOR, Circuit Judge, dissenting.

I am of the opinion that the order appealed from should be enforced, with the exception of the requirement of a refund of the check-off dues.

I believe that there was substantial evidence to support a finding of interference in the formation of the Independent Union of Gear Workers. There was substantial evidence that the Employee Representation Plan, which functioned for a period of three years prior to the formation of the Independent, was a company controlled arrangement which was utilized by the company to prevent the formation of an outside union by the men rather than to afford an instrumentality for the promotion of the interests of the employees. The Employee Representation Plan could not function as an independent bargaining agency of the employees.

The testimony respecting the situation at the time of the transition from the old Representation Plan to the Independent Union furnished substantial evidence to support a conclusion by the Board that there was not a complete cessation of interference and domination by the employer. The decisions of the Supreme Court have construed the National Labor Relations Act to require that old organizations, which do not conform to the requirements of the Act, be abolished both in form and in substance; that the employees must be afforded an opportunity "to start afresh in organizing" (National Labor Relations Board v. Newport News Shipbuilding & Dry Dock Co., 308 U.S. 241, 60 S.Ct. 203, 208, 84 L.Ed. 219); and that the employer thereafter must refrain from any participation in the organization and administration of bargaining agencies.

I believe that there was substantial evidence to support the Board's conclusion that the petitioner in the instant case did not disassociate itself from the organization activities of the Independent Union to the extent required by the Act as construed by the Supreme Court in National Labor Relations Board v. Newport News Shipbuilding & Dry Dock Co., supra; National Labor Relations Board v. Pennsylvania Greyhound Lines, 303 U.S. 261, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307; and National Labor Relations Board v. Pacific Greyhound Lines, 303 U.S. 272, 275, 58 S.Ct. 577, 82 L.Ed. 838.

624

The Board found that two employees, Rakowski and Matoska, had been discharged for union activities. Rakowski took the lead in the organization of S. T. B. A. and solicited 24 of the 33 original members. It is clear from the testimony that he was known to be active in his support of the outside union. When he was discharged he was told that the reason for such action was a slump in business; it was necessary, however, to have someone to perform Rakowski's work. Rakowski remonstrated on the basis of his record as an employee and was told that "in addition" to getting out a good day's work "the company expected their employees to be loyal." In response to Rakowski's statement that he did not know what was meant by "loyalty" he was told "you think it over" and that he "would understand after giving it some thought." Rakowski's efficiency as an employee was not questioned; he had received seven salary increases during the period of his employment. Since there was evidence which indicated a hostile attitude on the part of the management of the petitioner toward outside unions, the Board reasonably could have concluded that Rakowski's disloyalty consisted of his support of the outside union.

Matoska was active in organizing the shop employees, and during the period of the existence of the old Employee Representation Plan had voiced opposition to it and had resigned as a shop committeeman. He was active in opposing the Independent and in soliciting membership for the Amalgamated. Matoska was elected vice-president of the Amalgamated four days before his discharge. The reason given to Matoska for his discharge was "insubordination." The alleged insubordination centered around an incident in respect to which the evidence was such that the Board cannot be said to have acted unreasonably in drawing the inference that the incident was utilized as a pretext for the discharge of Matoska.

The majority opinion suggests that the fact that the president of the Amalgamated was not discharged indicates that union activity was not the reason for the discharge of Matoska. But, perhaps, the testimony of Mr. Barr, petitioner's vice-president, who personally discharged Matoska, throws some light on the question. At least such testimony was not without probative value. Barr testified that Stout, the president of the Amalgamated, had told him that he, Stout, was "all fed up on this C. I. O. stuff," and that he, Stout, did not "want to have anything more to do with it." Certainly the testimony of Barr was sufficient to justify an inference by the Board that failure to discharge Stout, the president of the Amalgamated, did not indicate an approval of union activities, either of Stout or Matoska.

In making its findings of fact the Board was required to appraise conflicting testimony, determine questions of credibility, and to rely upon inferences of fact which properly could be drawn from the testimony which the Board considered worthy of belief. If we resolve conflicts in favor of the findings of the Board, and attribute credibility to the witnesses whose testimony supports the findings, and recognize the reasonable inference which the Board was entitled to draw therefrom, I believe that the findings are supported by substantial evidence.

I believe the order of the Board should be affirmed except as to that portion which requires the employer to refund the check-off dues.